### In the Interest of B.K.D., G.D.D. and A.C.W., Children.

No. 2–02–289–CV.

Court of Appeals of Texas, Fort Worth.

Sept. 11, 2003.

Rehearing Overruled Feb. 12, 2004.

12

Versel Rush, Wichita Falls, for appellant Gwendolyn W.

Mark H. Barber, Wichita Falls, for appellant Billy W.

Greg King, Wichita Falls, for appellant John D.

Thomas L. Allensworth, Wichita Falls, for the children.

C. Ed David, TDPRS General Counsel, Phoebe Knauer, Deputy General Counsel, Cathy Morris, Chief Attorney for Field Operations, Sarah R. Guidry, Supervising Attorney for Field Operations, Special Litigation Unit, Sandra B. Self, Trial and Appellate Counsel, Special Litigation Unit, Abilene, for appellee.

Panel F: CAYCE, C.J.; HOLMAN and GARDNER, JJ.

## OPINION

PER CURIAM.

This is an appeal from a judgment rendered on a jury verdict terminating the parental rights of Gwendolyn W. and John D. as to their two children, B.K.D. and G.D.D. The order also terminated Gwendolyn and Billy W.'s parental rights to their child, A.C.W. On appeal, Gwendolyn, Billy, and John each complain that the evidence is insufficient to support the verdict. We will affirm.

## Factual Background

After a rocky five-year marriage, Gwendolyn and John divorced in July 1996. Gwendolyn was appointed managing conservator of the children. John was allowed visitation and ordered to pay child support.

In June of 1998, B.K.D. alleged that John had sexually assaulted her. She later recanted her story, however, and claimed that Gwendolyn's stepfather (her stepgrandfather) had licked and fondled her. Gwendolyn did not report B.K.D.'s allegations to the police, but she did take her to the pediatrician for an examination. The pediatrician refused to perform the examination, and instead, contacted CPS. CPS then had Dr. Terry Johnson perform a rape examination on B.K.D. Dr. Johnson concluded that B.K.D. exhibited negative physical characteristics that could be consistent with her allegations of fondling.

On July 7, 1998, Kathy Dudley, a CPS supervisor, interviewed B.K.D. Based on the details B.K.D. was able to provide regarding the assault, Dudley concluded that B.K.D. was telling the truth. Dudley also interviewed G.D.D. During the interview, G.D.D. crawled over Dudley, made statements of a sexual nature to her, and touched her breasts. This behavior caused Dudley to believe that G.D.D. had also been exposed to sexual activity. Dudley concluded that there was a continued risk for further sexual abuse and referred the case to the family preservation unit at CPS. Jamie Brumley, a CPS caseworker, was then assigned to the case. After a full investigation into the allegations, CPS concluded that the allegations against John were indeterminable, but concluded that there was reason to believe that Gwendolyn's stepfather had molested B.K.D. As a result, Gwendolyn entered into a safety plan with CPS, agreeing not to allow her stepfather near B.K.D. In addition, CPS agreed to provide counseling for B.K.D. and Gwendolyn, as well as parenting classes for Gwendolyn.

In February of 1999, Gwendolyn met Billy. The following month, Billy moved in with Gwendolyn and the children. On April 3, John contacted CPS and reported that Gwendolyn was violating the safety plan by allowing unsupervised contact between the children and Gwendolyn's stepfather. The following day, John reported to CPS that Billy was excessively disciplining the children.

Then, in August 1999, Dudley investigated a report that B.K.D. had stated that she did not want to visit her father because he "touches [me] in places he's not supposed to." Dudley interviewed B.K.D., G.D.D., Gwendolyn, and John. B.K.D. told Dudley that John had touched her sexually, but that it had been a "long time ago." After interviewing John, Dudley concluded that the allegations were unfounded.

Gwendolyn and Billy married in October 1999. In January 2000, A.C.W. was born. Around this same time, B.K.D. began having behavioral problems at school. Then, in November 2000, Gwendolyn discovered B.K.D. and one of her minor cousins inside a closet involved in inappropriate contact.

On February 5, 2001, B.K.D. took a note to her teacher at school alleging, "My step dad touched me in the wrong place," and "My step dad is also saying he will kill me and my brother [G.D.D.] so help us pleace [sic]." The case was referred to CPS for investigation. B.K.D. told investigators that Billy had been touching her with his fingers and tongue. She stated that this had been occurring since November of 2000, and the last incident had occurred on February 3, 2001. Once again, Dr. Johnson conducted a rape examination of B.K.D. This time, the examination revealed microscopic, superficial lacerations in her vaginal area that were consistent with her allegations of abuse.

## Procedural Background

CPS immediately took possession of B.K.D., G.D.D., and A.C.W. On February 6, 2001, CPS filed a petition for emergency protection. The trial judge entered temporary orders on March 7, 2001. On June 19, 2001, the trial court amended the temporary orders and awarded CPS temporary sole managing conservatorship of B.K.D., G.D.D., and A.C.W.

In August 2001, CPS filed an amended petition for protection of the children and for termination of Gwendolyn, John, and Billy's parental rights. The case was tried to a jury. On July 31, 2002, the jury returned a verdict of termination. As a result, the trial court entered an order terminating the parental rights of Gwendolyn, John, and Billy.

On August 14, 2002, Billy filed a motion for new trial, alleging that the evidence was legally and factually insufficient to sustain the jury's finding that termination of his parental rights was in the best interest of A.C.W. Then, on August 21, 2002, John filed a motion for new trial voicing the same complaint. Both motions expired by operation of law.

## Standard of Review

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." TEX. FAM.CODE ANN. §§ 161.001, 161.206(a) (Vernon 2002); *In re G.M.*, 596 S.W.2d 846, 847 (Tex.1980). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *G.M.*, 596 S.W.2d at 847; *In re D.T.*, 34 S.W.3d 625, 630 (Tex.App.-Fort Worth 2000, pet. denied) (op. on reh'g). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007.

This higher burden of proof required in termination cases alters the appellate standard of legal sufficiency review. *In re J.F.C.*, 96 S.W.3d 256, 265 (Tex.2002). The traditional no-evidence standard does not adequately protect the parents' constitutional interests. *Id.* In reviewing the evidence for legal sufficiency in parental

termination cases, we must determine "whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction" that the grounds for termination were proven. *Id.* at 265–66. We must review all the evidence in the light most favorable to the finding and judgment. *Id.* at 266. This means that we must assume that the fact finder resolved any disputed facts in favor of its finding if a reasonable fact finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact finder could have disbelieved. *Id.* We must, however, consider undisputed evidence even if it does not support the finding. *Id.*

■ The higher burden also alters the appellate standard of factual sufficiency review. *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* In considering whether the evidence of termination rises to the level of being clear and convincing, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. *Id.* Our inquiry here is whether, on the entire record, a fact finder could reasonably form a firm conviction or belief that the parent violated one of the conduct provisions of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the child. *Id.* at 28.

## Termination of Gwendolyn's Parental Rights

■ In one issue, Gwendolyn contends that the evidence is legally and factually insufficient to establish by clear and convincing evidence that the termination of her parental rights was in the best interest of her children.[1] To preserve a challenge to the legal sufficiency of the evidence for appeal, a party must do one of the following: (1) file a motion for instructed verdict; (2) object to the submission of a jury question; (3) file a motion for judgment notwithstanding the verdict; or (4) file a motion for new trial. *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991); *In re J.M.S.*, 43 S.W.3d 60, 62 (Tex.App.-Houston [1st Dist.] 2001, no pet.); *In re A.P.*, 42 S.W.3d 248, 254 n. 1 (Tex.App.-Waco 2001, no pet.), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d 256 (Tex.2002).

■ Gwendolyn did not, by any of these methods, challenge the legal sufficiency of the evidence that termination was in the children's best interest. Therefore, we hold that Gwendolyn failed to preserve her legal sufficiency challenge for our review. *See In re C.E.M.*, 64 S.W.3d 425, 427–28 (Tex.App.-Houston [1st Dist.] 2000, no pet.).

■ Further, to preserve a challenge to the factual sufficiency of the evidence for appellate review, the party must file a motion for new trial in the trial court. Tex.R. Civ. P. 324(b)(2), (3); *Cecil*, 804 S.W.2d at 510; *C.E.M.*, 64 S.W.3d at 428; *J.M.S.*, 43 S.W.3d at 62. Gwendolyn did not file a motion for new trial. Therefore, she has waived her right to complain about the factual sufficiency of the jury's finding that termination was in the children's best interest. *See C.E.M.*, 64 S.W.3d at 427–28 (holding that sufficiency issues must be

---

1. Gwendolyn does not, however, challenge the jury's findings that she "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the children" or "knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children."

properly preserved in a termination of parental rights case just as in any other civil case); *J.M.S.*, 43 S.W.3d at 62 (same). Gwendolyn's sole issue is overruled.

### Termination of John's Parental Rights

■ In his first issue, John contends that the evidence is legally and factually insufficient to support the legal grounds for termination as required by section 161.001(1) of the Texas Family Code. Tex. Fam.Code Ann. § 161.001. In proceedings to terminate the parent-child relationship brought under section 161.001, the petitioner must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. If multiple grounds for termination are alleged and the trial court submitted the termination issue using a broad-form question asking the jury whether the parent-child relationship should be terminated, the jury's finding will be upheld on any ground supporting the finding. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990) (op. on reh'g); *In re P.R.*, 994 S.W.2d 411, 415 (Tex.App.-Fort Worth 1999, pet. dism'd w.o.j.), *disapproved on other grounds by J.F.C.*, 96 S.W.3d 256. A finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *In re A.R.R.*, 61 S.W.3d 691, 698 (Tex.App.-Fort Worth 2001, pet. denied), *disapproved on other grounds by In re A.V.*, 113 S.W.3d 355 (2003) and *In re C.H.*, 89 S.W.3d 17 (Tex. 2002). Thus, to be successful on appeal, the appellant must establish that the jury's findings on all of the State's pleaded grounds are unsupported by the evidence. *In re B.B.*, 971 S.W.2d 160, 163 (Tex.App.-Beaumont 1998, pet. denied), *disapproved on other grounds by C.H.*, 89 S.W.3d 17; *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.).

■ Here, the jury found that John's parental rights should be terminated on four grounds under section 161.001(1) of the Texas Family Code. On appeal, John only challenges three of those grounds. He does not challenge the jury's finding that he failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of his children under section 161.001(1)(O). Because John does not challenge this ground, we need not address his argument that the evidence is insufficient to support the jury's findings on the other three grounds under section 161.001(1). Accordingly, John's first issue is overruled.

■ In his second issue, John contends that the evidence is insufficient to show that termination of his parental rights was in the best interest of B.K.D. and G.D.D. Although a strong presumption exists that the best interest of a child is served by keeping custody in the natural parent, this presumption may be overcome by clear and convincing evidence of the natural parent's present unfitness. *In re D.M.*, 58 S.W.3d 801, 814 (Tex.App.-Fort Worth 2001, no pet.); *Hall v. Harris County Child Welfare Unit*, 533 S.W.2d 121, 122–23 (Tex.Civ.App.-Houston [14th Dist.] 1976, no writ). In determining whether this presumption has been rebutted, the Texas Supreme Court has examined several factors, namely: the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and physical danger to the child, the parental abilities of the person seeking custody, programs available to assist those persons in promoting the child's best interest, plans for the child by those individuals or by the agency

seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976).

 Proof of acts or omissions under section 161.001(1) may also be probative of whether termination is in the child's best interest. *C.H.,* 89 S.W.3d at 28. Further, a fact finder may infer that past conduct endangering the well being of a child may recur in the future if the child is returned to the parent. *In re D.L.N.,* 958 S.W.2d 934, 941 (Tex.App.-Waco 1997, pet. denied), *disapproved on other grounds by J.F.C.,* 96 S.W.3d 256 and *C.H.,* 89 S.W.3d 17.

### B.K.D. and G.D.D.'s Desires

While in foster care, B.K.D. and G.D.D. wrote letters to Gwendolyn indicating that they loved their parents and wanted to come home. However, both children also expressed a desire to be adopted and told CPS workers that they did not want to go back and live with their parents.

### B.K.D. and G.D.D.'s Present and Future Emotional and Physical Needs

In 2000, Dr. David Sabine performed a psychological evaluation on B.K.D. He diagnosed B.K.D. as suffering from moderate attention deficit/hyperactivity disorder ("ADHD"), depressive disorder, anxiety and social anxiety, low global functioning, and "an unusually high level of pathology for a child at this age." As a result of B.K.D.'s anxiety and depressive disorders, Dr. Sabine concluded that she was in urgent need of clinical attention. He testified that individual psychotherapy was critical to her successful rehabilitation.

Dr. Sabine also evaluated G.D.D. He diagnosed G.D.D. with moderate ADHD and disruptive behavior disorder. During his evaluation, Dr. Sabine noted that G.D.D.'s stories were "replete with violence, death, and killing" which was unusual for a child of this age. Dr. Sabine testified that G.D.D.'s behavior could signify the presence of a depressive/anxiety disorder, but it was still too early to tell. He did, however, recommend individual therapy for G.D.D.

Based on his findings regarding each child, Dr. Sabine concluded that it would take a "fairly sophisticated level of knowledge and understanding about parenting, and about these disorders specifically," to provide the proper environment for B.K.D. and G.D.D. In addition, he stated that permanency was of the utmost importance to these children.

### Parental Abilities

According to the record, John's parental abilities were virtually nonexistent. Despite the fact that he did not work during his marriage to Gwendolyn, he rarely cared for B.K.D. and G.D.D. At trial, John even admitted that he "didn't really have that much quality time with the children." He testified that during the marriage, he would usually stay at a neighbor's house. In addition, when he was around the children, the record reveals that he was oftentimes physically and emotionally abusive toward them. Michelle Bradley, Gwendolyn's aunt, testified that John would "smack the kids around because he wanted to see them hurt."

After the divorce, John testified that he exercised his visitation rights as often as possible. Gwendolyn, however, often refused to allow him to exercise his full visitation rights. Although John claimed that he had attempted to obtain legal assistance to enforce these rights, he presented no evidence that he had filed any paperwork with the court regarding this matter and was unable to name one attorney he had consulted.

After CPS took the children into custody, John was allowed one hour of visitation with the children each week. Kerri Herrera, the children's CPS worker, observed that John repeatedly spent more time visiting with her or the volunteer than he spent with his children. She also noted that the children were ready to leave before the visits ended. Frequently, she had to tell them to go back and finish the visit, and she also had to remind them to say goodbye to their father. Further, at the conclusion of the visits, the children were not upset or distraught.

At trial, John admitted that he was not ready for the children to be placed with him in his home even after having seventeen months to secure appropriate accommodations. He testified that he had a three-bedroom home in need of repair. Some of the problems with the residence included a "gap" around the bathtub, a bathroom sink that needed to be remounted, and a hole in the wall. John testified that he had not had time to repair the residence, even during times when he was unemployed, because he had been "out doing twenty to forty miles a day on foot looking for a job." The photographs of the residence taken by CPS shortly before the trial showed clutter and cat feces on the floor of B.K.D.'s room. Herrera testified that the home was not a clean, safe, or stable environment for the children.

### Allegations of Sexual Assault

In 1998 and 1999, B.K.D. accused John of sexually abusing her. She stated that John had placed cream in her genital area. When interviewed by CPS, however, B.K.D. recanted and stated that John had not touched her since she was four years old. After interviewing John, CPS determined that the allegations were unfounded. Accordingly, no charges were ever filed. Then, in 2001, these same allegations resurfaced while B.K.D. was in foster care.

After an investigation, however, the allegations were administratively dismissed because the issue had been resolved in the 1998 and 1999 investigations.

B.K.D. was not the only young girl to accuse John of inappropriate conduct. He was barred from the Boys and Girls Club after a little girl reported that he had tried to look up her dress. In addition, at the time of trial, John was facing a possible eviction from his home due to allegations of inappropriate contact with his niece and two of her friends who often stayed with John at his residence.

At trial, John admitted that he had difficulty controlling his sexual urges. He also testified that his first sexual encounter occurred when he was four years old. He stated that he had both oral and regular sex with a seven-year-old girl. Although John testified that he became addicted to sex, he characterized this contact as a "normal childhood curiosity."

### Other Acts or Omissions of the Parent

As for John's acts and omissions, the evidence reveals that he had difficulty managing his anger. In 1996, John threatened Gwendolyn with a knife and then threw the knife to her and told her to kill him. On several occasions he also threatened that, if he could not have the children, no one would. In March 1996, he held Gwendolyn down on the bed, choked her, and would not let her go. Gwendolyn managed to get away, and the next day she and the children left. Gwendolyn obtained a protective order and filed for divorce. Later, John was arrested and twice convicted of violating the protective order.

The record also reveals that John suffered from severe psychological and emotional problems, including hypochondria, depression, and anxiety. He even admitted that he had checked himself into the Helen Farabee mental health facility on

three separate occasions due to suicidal ideations. Further, he admitted that he was "argumentatively volatile" and often yelled during his marriage to Gwendolyn. His personality assessment revealed that he was impulsive; had difficulty with rules, regulations, and authority; and did not learn from his mistakes.

After the divorce, John filed several reports with CPS complaining that Billy and Gwendolyn were over-disciplining the children and allowing Gwendolyn's stepfather into their home despite B.K.D.'s allegations against him. Aside from these reports, however, John took no action to have the children removed from Gwendolyn's custody.

From 1996 until the trial in this case, John worked, but he did not hold down a steady job. At the time of trial, John testified that he was working as a mental health aide making $5.75 per hour and paying his child support. The evidence revealed, however, that John owed a total of $8,654.05 in back child support. Although John testified that he was both psychologically and physiologically equipped to gain and maintain regular employment, he did not pay any child support from July 2000 until March 2001.

In 2001, after CPS removed the children from Gwendolyn's home, the trial court ordered John to submit to a psychological evaluation and counseling. Although he submitted to the evaluation, he admitted that he failed to complete the required counseling sessions. He testified that his employment interfered with his ability to attend the counseling sessions and that he "felt that the counseling wasn't doing [him] very good."

Further, at trial, John admitted that he was living with a woman who had had her parental rights to her children terminated in Michigan. When asked whether he planned to continue this relationship, John stated that the future of their relationship would depend on "what this Court says and these jurors say, as opposed to our relationship."

### Plans for the Children

Although CPS did not have an adoptive home ready for them at the time of trial, Herrera testified that she did not believe that it would be difficult to find an adoptive home for the children. In spite of the children's emotional and behavioral problems, Herrera testified that her placement success rate was very high. She also stated that CPS would stipulate that all three children be placed together.

John testified, however, that if he regained custody of B.K.D. and G.D.D. that he planned to improve his life by taking on an additional job and seeking a higher paying job with the State. He said nothing about caring for and meeting the emotional needs of his children.

After reviewing the entire record in this case, we hold that the evidence is legally and factually sufficient to sustain the verdict. While we realize that it is more difficult to place older children and to keep three siblings together, in this particular case, we cannot say that this factor alone is enough to overcome the jury's finding that termination is in the children's best interest. Based on all the evidence discussed herein, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of John's parental rights was in B.K.D.'s and G.D.D.'s best interest. Accordingly, we overrule John's second issue.

### Termination of Billy's Parental Rights

In two issues, Billy also contends that the evidence is legally and factually insufficient to establish that termination was in the best interest of A.C.W.

### A.C.W.'s Desires

A.C.W. was only two years old at the time of trial. Therefore, he was too young to express his desires.

### A.C.W.'s Emotional and Physical Needs

Due to A.C.W.'s age, there is no evidence in the record that he suffered from any emotional or behavioral disorders. The record does, however, reveal that A.C.W. was frequently ill and small for his age. After he was taken into CPS's care, tubes were surgically inserted into his ears to extinguish a recurring ear infection.

### Parental Abilities

With regard to Billy's parental abilities, the record reveals that he had an extensive history with CPS. During his relationship with another woman, Betty Brant, Billy had fathered four children. Although he contends that Betty's first child was not his, Billy voluntarily relinquished his rights to this child after CPS took the child into protective custody pursuant to allegations that Betty had smothered the child with her breast. Their second child was born with barbiturates in its system. Despite Billy's contention that his parental rights were involuntarily terminated, the record shows that he voluntarily signed a waiver of relinquishment. Billy's parental rights to the third child were involuntarily terminated, however, after a jury concluded that Billy "had a mental or emotional illness or mental deficiency that rendered [him] unable to provide for the physical, emotional, or mental needs of the child." Billy voluntarily relinquished his rights to his fourth child by Betty after the court appointed him possessory conservator, gave him visitation rights, and ordered him to pay child support.

Before Billy became involved with Betty, he had been married and fathered a son. Despite his claims that he could have visited this child anytime he desired, Billy testified that he had only seen the child approximately eight times in the several years since his divorce. He admitted that he had never paid child support, but he also claimed that his ex-wife refused his money.

After CPS removed A.C.W., Billy admitted that he lacked consistency in his visitation with A.C.W. He blamed this inconsistency on his truck driving job. After leaving this job, however, he continued to miss visitation. When asked about visitation, Billy stated that his visitation with A.C.W. was like dealing with a "stray animal. You don't know that animal, you don't know if that dog's going to bite you or not, and they're trying to keep a distance from you; its like they're trying to protect theirself."

When Billy did visit A.C.W., there was very little interaction between them. Herrera testified that, during visitation, Billy "holds [A.C.W.] a lot of times and doesn't want to let him down, and when [A.C.W.] is frustrated and wants to get down and play, [Billy] often will grab him or pull him." Further, when the visits were concluded, A.C.W. was not upset or disturbed.

### Alleged Sexual Abuse

In February 2001, B.K.D. accused Billy of touching her "in the wrong place." Billy was arrested and charged with aggravated sexual assault in July 2001. After he spent three months in jail, the grand jury found that there was insufficient evidence to prosecute the case, and the criminal charges against him were dismissed. CPS did not, however, dismiss its termination suit.

Although Billy claimed that he did not sexually assault B.K.D., her medical examination revealed abrasions and lesions in her genital area that were consistent with her accusations. Even Gwendolyn's expert witness agreed that the physical find-

ings shown in Dr. Johnson's report could be consistent with B.K.D.'s outcry of sexual abuse.

Billy contends, however, that the abrasions were self-inflicted. Although there was some testimony that the abrasions may have been self-inflicted, Dr. Johnson testified that the abrasions that he observed were much too extensive to have been caused by self-stimulation or excessive scratching. Unlike the long, thin linear lesions caused by scratching, the lesions he observed were rounded and sporadic.

Billy also contends that B.K.D.'s allegations against him were too similar to the allegations she made against Gwendolyn's stepfather to be true. Initially, B.K.D. did accuse both men of fondling and licking her private parts. The alleged methods of fondling, however, were somewhat different. B.K.D. accused Gwendolyn's stepfather of "rubbing" her in her "private parts [with] his tongue and his mouth." She accused Billy of touching her in her "vagina with his fingers and his tongue." Further, as time progressed she revealed more distinguishing details regarding the alleged abuse by Billy.

There were also some discrepancies in B.K.D.'s story regarding whether she was asleep during the assault, whether the fondling was painful, and whether she had her panties on or off. Kathy Dudley, a supervisor with CPS, testified, however, that it is not uncommon for children who have been sexually abused to make some remarks that are incompatible with the rest of their statement. In spite of these contradictory statements, Dudley "felt that [B.K.D.] was able to give details and circumstances about the alleged sexual abuse, that a child who has not been victimized, would not have any way of knowing." Three other experts also agreed that the inconsistencies in B.K.D.'s statement did not necessarily make her allegations of sexual assault untrue. Dr. Sabine testified that he would not be surprised to find inconsistencies in a child's statement regarding sexual abuse because the trauma of the abuse often induces a dissociative experience within the child. In such instances, the abuse is often too difficult or embarrassing for the child to approach directly. When the child does report the assault, the report may seem inconsistent. In truth, however, the inconsistencies are merely a function of the child's inability to directly express the trauma of the assault. Further, Dr. Edward Gripon, Gwendolyn's own expert, testified that it is not uncommon for the statements of childhood victims of sexual assault to contain some inconsistencies. This is because, as time goes on, these children tend to recall and reveal more details regarding the assault. Camille Cleveland, another CPS worker, agreed that it is common for sexually abused children to "disclose more as time goes by, as they feel more comfortable and as they feel safe."

**Other Acts or Omissions**

Billy has a history of sexual deviance and abuse. As a child, Billy was sexually abused by his father and brothers. Then, in 1981, CPS investigated Billy for allegations that he had sexually abused his five-year-old nephew. When the child was removed from the home, Billy threatened the CPS caseworker assigned to the case. Later, CPS also investigated two more complaints against Billy made by two other nephews.

At trial, Billy admitted that he had a bad attitude and temper. He testified that he had threatened John's life in the presence of B.K.D. and G.D.D. Herrera also testified that Billy made a threatening statement against John to her. In addition, three to four months before the children were removed from the home, Billy told

John in G.D.D.'s presence that if the children were taken away, someone was going to die.

On two separate occasions, John filed a complaint with CPS alleging that Billy was excessively disciplining the children. Herrera observed Billy during his visitation with A.C.W. and testified that Billy was rough with A.C.W. She stated that Billy often grabbed or pulled A.C.W. in a manner that upset him.

In addition, Billy failed to abide by the trial court's temporary orders. He did not pay court-ordered child support and failed to complete the required psychological and drug evaluations. Further, in spite of the temporary orders that prevented Billy from visiting A.C.W. on the days that Gwendolyn visited B.K.D., Billy admitted that he occasionally drove Gwendolyn to these visits and that B.K.D. may have seen him. In fact, on at least one occasion, B.K.D. did see him pick up her mother from visitation. As a result, she became very upset.

**Future Plans**

Again, at the time of trial, CPS did not have an adoptive home for A.C.W. CPS did not, however, believe that it would be difficult to find a placement for him. Herrera testified that her placement success rate was very high and that CPS would stipulate that A.C.W. be placed in the same adoptive home as B.K.D. and G.D.D. In addition, experts testified that it was very important that the children be permanently placed as soon as possible.

With regard to Billy's plans for A.C.W., he merely testified that he planned to gather up Gwendolyn, the children, and their belongings and drive as far away from Texas CPS as they could get. He did not discuss any particular changes that he would make if A.C.W. were to be returned to him. Further, he detailed no specific plans for A.C.W. in the event of reunification.

Therefore, based on Billy's history with CPS, history of sexual deviance and abuse, failure to abide by the trial court's temporary orders, and B.K.D.'s allegations of sexual assault, we hold that the evidence is both legally and factually sufficient to support the verdict. Accordingly, Billy's sole issue is overruled.

### Conclusion

Having overruled each of the appellants' issues on appeal, we affirm the trial court's judgment.