299 S.W.3d 919 (2009)
In the Interest of E.I.T.
No. 09-09-00067-CV.
Court of Appeals of Texas, Beaumont.
Submitted September 23, 2009.
Decided November 5, 2009.
*920 Marva Provo, Beaumont, pro se.
Tom Maness, Crim. Dist. Atty., Randi A. King, Asst. Crim. Dist. Atty., Beaumont, for appellee.
Before GAULTNEY, KREGER, and HORTON, JJ.

OPINION
HOLLIS HORTON, Justice.
This appeal involves the involuntary termination of the parent-child relationship between C.T. ("Mother") and E.I.T. ("Son"). The trial court found, by clear and convincing evidence, that multiple statutory grounds supported the termination, and that terminating Mother's parental rights would be in Son's best interest.[1]See TEX. FAM.CODE ANN. § 161.001(1)(E), (L)(ix), (O) (Vernon Supp. 2009); TEX. FAM.CODE ANN. § 161.001(2) (Vernon Supp. 2009).[2] After the trial, and with respect to her appeal, the trial court found Mother to be indigent, appointed an attorney to represent her for purposes of the appeal, and found that an appeal would not be frivolous. Both the reporter's and clerk's records have been filed, and her appointed attorney filed a brief on the merits.
Raising four appellate issues, Mother asserts the evidence is factually and legally insufficient to support the trial court's findings that: (1) she engaged in conduct that endangered Son's physical or emotional well-being or knowingly placed Son with persons who engaged in such conduct, (2) Son's best interest would be served by terminating the parent-child relationship, (3) she failed to comply with the requirements of a family service plan while Son was in the temporary care of the Texas Department of Family and Protective Services (Department), and (4) she had been previously convicted of causing a serious bodily injury to another child. After reviewing the record and the evidence, we affirm the trial court's order.

Background
Mother gave birth to Son in December 2007, and at the time of the trial, which *921 occurred on February 19, 2009, Mother was twenty-eight years old. In April 2008, the Child Protective Services Division (CPS), a division of the Department, received a report of suspected physical abuse and neglectful supervision concerning Son and opened an investigation. In early April 2008, Mother voluntarily placed Son in the care of C.T., one of her sisters. Subsequently, CPS placed Son in foster care, where he was living at the time of the trial.
At CPS's initial visit to investigate the report of Son's suspected abuse, the CPS investigator found that Son had suffered an apparent eye injury that involved a "linear mark across his eye, both on his face, his eyelid, and on the actual eye itself." The investigator further stated that when she saw Son's injury it was her opinion that the Son did not need further medical attention. According to Mother, the injury to Son that led to the CPS investigation was a black eye.
Mother gave differing accounts about how Son's injury had happened. She initially told the CPS investigator that Son was injured when he fell off a couch while in the care of her sister, N.T. Later, Mother stated that the injury occurred when Son fell out of a bed. At trial, Mother testified that N.T.'s child had caused Son's injury by throwing a toy at him.
Moreover, Mother's inconsistent statements were not limited to causation of Son's injury. She also made inconsistent representations about the identity of Son's father. Initially, Mother gave CPS the names of several possible fathers, including L.W., who is the father of her daughter.[3] Later, Mother told the trial court that A.R. was Son's father. Despite the fact that based on her representations L.W. had been dismissed from the suit, at trial Mother returned to her claim that L.W. was Son's father, and she testified at that point that she was sure that L.W. was Son's father.[4]
Mother's historical employment record or educational background is not provided in the record. However, there is evidence that Mother had been employed in the six-week period prior to trial. During that period, Mother worked as a housekeeper at a motel and as a caretaker of a disabled man.[5] According to Mother's trial testimony, she lives in a garage apartment that she rented from her elderly employer. The apartment is located adjacent to her employer's home, and there are photographs of the interior of Mother's apartment in the record.
A report by a court-appointed special advocate[6] (CASA) notes that Mother's *922 apartment appeared well kept and furnished. However, the CASA volunteer's report also indicates that raw sewage was coming from the back of the building, and that an adjacent apartment had broken windows and was accessible through an open door.
Mother's sister, C.T., also testified at the trial. In her opinion, it was in Son's best interest for the Department to find a family to adopt him. However, C.T. also testified that she had never observed Mother harm Son, and that she could not honestly say he should be taken from Mother.
Some of the evidence introduced during the trial addressed Mother's mental health. The record shows that Mother suffers from an emotional disorder, but there is little evidence regarding whether she was receiving any treatment for the disorder. While there is evidence that Mother was evaluated by a psychologist, no psychologist or any other of Mother's health care providers were called as witnesses at the trial. Most of Mother's medical information in the trial record is contained in the CASA volunteer's report, which was admitted into evidence without objection. The CASA report states that Mother's medical records indicate she was diagnosed in 2004 with intermittent explosive disorder, but Mother's medical records were not offered into evidence.[7] Mother's trial testimony does not reveal whether she received treatment following her 2004 diagnosis. Nevertheless, the CPS supervisor in charge of Mother's case emphasized her concern about Mother's emotional condition and explosive disorder in testifying that termination was in Son's best interest.[8]
As to Mother's compliance with court orders and the family service plan, Mother testified that she had done everything she was capable of doing to comply with the service plan and the requirements of her probation. The trial court, however, found that Mother had not complied with "the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the [child]. ..." Evidence introduced during the trial only generally addressed whether Mother had complied with various aspects of her family service plan, but did not specifically address whether the degree to which the Mother failed to comply with the plan was considered by Department to have been material with respect to child's interest.[9] During her testimony, the CPS *923 supervisor stated that Mother had not fully completed all of the items required in her plan of service. Later, the supervisor specifically stated that Mother had not maintained housing appropriate for both her and Son for a period of four consecutive months. The supervisor also stated that there were times that Mother had not maintained employment, but the length of such periods of Mother's failure to maintain employment were not further developed in the record, and the CPS supervisor was not asked whether she considered Mother's lapses of employment as having violated the requirements of the family service plan.

Standard of Review
An order that terminates a parent's relationship with a child must be supported by clear and convincing evidence. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp. 2009); In re J.F.C., 96 S.W.3d 256, 264 (Tex.2002). In a legal sufficiency review, "a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." Id. at 266. A factual sufficiency review is only slightly less deferential to the factfinder, as under that standard "a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." Id. Under a factual sufficiency standard, the findings are sufficient unless, based on the entire record, "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the fact in issue was true. Id.
Along with a finding that the termination of a parent's rights is in the child's best interest, a parent's rights may be involuntarily terminated for any one of the various grounds that are provided by section 161.001(1) of the Texas Family Code. In re B.K.D., 131 S.W.3d 10, 16 (Tex.App.-Fort Worth 2003, pet. denied). In this case, the trial court's order provides three separate grounds to support its decision to terminate Mother's parental rights with Son. Mother challenges the sufficiency of the evidence for each of the three grounds upon which the trial court's termination order relies. In addition, Mother challenges the trial court's finding that terminating her parental rights was in Son's best interest.

Discussion
On appeal, credibility determinations of the factfinder are given significant deference. As the Texas Supreme Court explained:
Issues of credibility that depend on appearance and demeanor cannot be weighed by the appellate court; the witnesses are not present. And even when credibility issues are reflected in the *924 written transcript, the appellate court must defer to the jury's determinations, at least so long as those determinations are not themselves unreasonable.
Southwestern Bell Tel. Co. v. Garza, 164 S.W.3d 607, 625 (Tex.2004); see also In re J.O.A., 283 S.W.3d 336, 346 (Tex.2009). In this trial, the trial court resolved disputed facts, including whether Mother had caused Son's injury. Because there were no witnesses who asserted they saw who injured Son, the trial court's conclusion was largely based on circumstantial evidence that revolved around the credibility of the witnesses.
Under a legal sufficiency standard, we find that there was sufficient evidence to allow the trial court to reach a firm conviction that Mother had caused Son's injury. The evidence before the court reveals that Mother was diagnosed in 2004 with intermittent explosive disorder. Then, based on a 2006 incident with her infant daughter, the evidence further reflects that Mother pled guilty to injuring a child. Further, the trial court could consider that Son's injury occurred while Mother was his primary caretaker, and except for Mother's own testimony that Son's injury had been caused by others, no additional evidence supported her explanation of Son's injury. Importantly, in light of Mother's various accounts to explain Son's injury, the trial court could conclude she was simply not credible.
Under a clear and convincing standard, we hold the record contains evidence that is legally sufficient to show that Mother caused Son's injury. See Canaday v. State, 853 S.W.2d 810, 813 (Tex.App.-Beaumont 1993, no pet.) ("Evidence of prior child abuse combined with other evidence can render circumstantial evidence sufficient to support a conviction of injury to a child.") (citing Tezino v. State, 765 S.W.2d 482, 485 (Tex.App.-Houston [1st Dist.] 1988, pet. ref'd)). We overrule Mother's legal sufficiency challenge to the evidence.
Mother also challenges whether the evidence is factually sufficient to justify the verdict. After giving due consideration to any contrary inferences supported by the evidence, we also conclude that the evidence is factually sufficient to support the trial court's finding that Mother injured Son. In this case, there was evidence that Mother had been diagnosed in 2004 with a disorder that causes difficulty in controlling impulses and thereby causes the person to commit aggressive acts. The record further reflects two specific incidents consistent with that earlier diagnosis, one in 2006 involving her infant daughter, and one that involved the physical abuse of Son.
Significantly, there is no testimony that any medical providers who saw and diagnosed Mother's impulse control disorder provided her with treatment, or testimony that she had been treated for the disorder following Son's eye injury. Further, Mother did not testify that she had recovered or been cured from the affects of her impulse control disorder, diagnosed in 2004, by the time of the trial.
Based on the record before us, Mother failed to dispute that she had intermittent explosive disorder. We cannot credit her with an inference that her medical providers had either treated her condition or cured it, as the evidence in the record does not reflect that Mother had obtained treatment for the disorder. Consequently, based on the record before us, we conclude that the trial court could form a firm belief or conviction that a decision to leave Son in Mother's possession would expose him to her future outbursts, thereby presenting a danger to his physical or emotional well-being. We hold the record is factually sufficient to show that leaving Son with Mother endangered Son's physical and *925 emotional well-being. Having considered both Mother's legal and factual sufficiency arguments, we overrule Mother's first issue.
Mother's second issue challenges the trial court's finding that terminating her parental rights was in Son's best interest. But, as we have explained, nothing in the record demonstrates that Mother's emotional disorder was either controlled or capable of being controlled. Moreover, given a four-year history of the course of the condition on Mother's relationships, the evidence suggests that Mother's disorder was not controlled. Certainly, Mother's outbursts in injuring her daughter and then later injuring Son tend to show that she did not possess the ability to control her impulses to harm her children.
The trial court could also consider Mother's plans for the child as compared to the plans of the Department. It appears that Mother's plan was to live with the child in the apartment adjacent to the home in which she worked. But the trial court might have considered Mother's plans less than desirable, due to the state of disrepair of the adjacent apartment, and the presence of raw sewage outside the apartment. Based on Mother's testimony, and the short length of time she had lived in the apartment next to her employer, the court could also reasonably conclude that Mother was not able to provide housing that was appropriate for Son. Mother's plans contrasted with those of the Department, whose supervisor testified that Son had been cared for in foster home presently and was highly adoptable. The CASA volunteer also reported that she had observed Son in the foster home and that he appeared happy and was getting along well with his foster parents.
In summary, the evidence before the trial court allowed the trial court to reach a firm conviction that termination was in Son's best interest. The trial court could reasonably conclude that Son's best interest would be served by the Department's plan of having Son in a safe environment with a goal of adoption instead of Mother's plan. Mother's second issue is overruled.
We need not address issues three and four, as resolving them is not necessary to the final disposition of Mother's appeal. See TEX.R.APP. P. 47.1; see also In re B.K.D., 131 S.W.3d at 16.

Conclusion
Based on the evidence before it, we conclude that the trial court could reasonably form a firm belief or conviction that Mother had engaged in conduct that endangered Son's physical or emotional well-being. Based on that same evidence, the trial court could further form the firm belief or conviction that termination of Mother's parental rights was in Son's best interest. Accordingly, we affirm the trial court's order.
AFFIRMED.
NOTES
[1] The trial court also terminated the rights of the child's unknown father. The court appointed trial counsel for the unknown father, but no appeal was filed on his behalf.
[2] Although the statute concerning the involuntary termination of parent-child relationships was amended after the Department filed its petition against Mother, there were no changes in the sections that are relevant to our analysis of this appeal. Compare Act of May 18, 2007, 80th Leg., R.S., ch. 593, § 3.30, 2007 Tex. Gen. Laws 1139-41 with current version at TEX. FAM.CODE ANN. § 161.001 (Vernon Supp. 2009). Therefore, we cite the current version throughout this opinion.
[3] At the May hearing, L.W. explained that he had custody of their two-year-old daughter, who had been taken from Mother due to an "unexplained injury." Mother pled guilty to having injured her daughter in August 2006 when her daughter was ten months old. The details in the record about the nature of the daughter's injuries are sparse, but the record indicates that Mother threw her daughter, causing facial injuries. As a result, the trial court sentenced Mother to two years in state jail and probated the sentence for a period of five years. Since her conviction, Mother has had no unsupervised contact with her daughter.
[4] While Mother admitted that her trial testimony contradicted the earlier representation she made to the court about Son's parentage, she attempted to explain the contradiction by asserting that L.W. said that she would never see their daughter again if she claimed he was Son's father.
[5] The record indicates that her employer's disability is an apparent self-inflicted gunshot wound and that he takes medication to control seizures.
[6] On April 28, 2008, the trial court appointed a CASA volunteer to serve as an advocate for the child as provided by the Texas Family Code. See TEX. FAM.CODE ANN. § 107.031 (Vernon 2008).
[7] Although not stated in the CASA report, the diagnostic criteria for intermittent explosive disorder, an impulse control disorder, are:

A. Several discrete episodes of failure to resist aggressive impulses that result in serious assaultive acts or destruction of property.
B. The degree of aggressiveness expressed during the episodes is grossly out of proportion to any precipitating psychosocial stressors.
C. The aggressive episodes are not better accounted for by another mental disorder (e.g., Antisocial Personality Disorder, Borderline Personality Disorder, a Psychotic Disorder, a Manic Episode, Conduct Disorder, or Attention-Deficit/Hyperactivity Disorder) and are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition (e.g., head trauma, Alzheimer's disease).
American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (Text Revision, 4th ed. 2000) 663, 667.
[8] The supervisor specifically mentioned Mother's emotional issues that concerned CPS; they included "explosive disorder, some impulsivity, and depression. Her global level of functioning is down."
[9] During the trial, the trial court took judicial notice of its file, which contains the family service plan. The family service plan was incorporated by reference into a court order following a hearing on June 26, 2008, that Mother did not attend. When the trial court conducted the hearing, Mother was not yet represented by counsel. At the end of that hearing, the trial court appointed an attorney to represent Mother, stating: "She may have some mental health problems." Additionally, the June 26 order contains a section that the trial court left blank; the section appears intended to allow the court to designate what actions are to "be taken to implement or require compliance with the service plans."

We express no opinion whether, under the circumstances of this record, the procedure followed by the trial court was sufficient to convert the entire family service plan into the equivalent of a court's order that specifically identified the actions required by Mother to obtain Son's return, as contemplated by the Texas Family Code. See TEX. FAM.CODE ANN. § 161.001(1)(O) (Vernon Supp. 2009).