

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-08-324-CV

IN THE INTEREST OF L.A.C.,
MINOR CHILD

------------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant A.C. appeals from the termination of her parental rights to son L.A.C. Because (1) Appellant does not raise a valid challenge to the finding under section 161.001(1)(M) of the family code,[2] (2) the evidence is legally and factually sufficient to support termination, and (3) the trial court did not reversibly err, we affirm the trial court's judgment.

---

[1] *See* Tex. R. App. P. 47.4.

[2] *See* Tex. Fam. Code Ann. § 161.001(1)(M) (Vernon 2008).

I.  Error, if any, in admitting evidence regarding Appellant testing positive for methamphetamine after L.A.C.'s birth is harmless, and termination is supported by legally and factually sufficient evidence.

The trial court allowed a CPS worker to testify, over objection, that the final straw that prompted the department to take action to remove L.A.C. from Appellant was a July 2007 hair follicle test on Appellant that was positive for methamphetamine.  The trial court gave a limiting instruction to the jury that the "testimony you're about to receive about the drug test is admitted to you not for the truth of the drug test or that the drug test was positive but to show—to aid you, if it does aid you, in explaining why the Department took the actions it did."  In her first issue, Appellant contends that the trial court abused its discretion by admitting the testimony when the results themselves were excluded.  Even if the trial court erred by admitting the testimony, which we do not hold, Appellant cannot show harm.

To obtain reversal of a judgment based upon an error in the trial court, the appellant must show that the error occurred and that it probably caused rendition of an improper judgment or probably prevented the appellant from

2

properly presenting the case to this court.[3]  We examine the entire record in making this determination of harm.[4]

In her second issue, Appellant contends that the evidence is legally and factually insufficient to support the judgment of termination, challenging the endangerment findings under subsections (D) and (E)[5] and the best interest finding.[6]  Because we combine our sufficiency review with our analysis of Appellant's issue complaining of evidentiary error, we exclude the challenged evidence from our review.[7]

In addition to finding by clear and convincing evidence that Appellant engaged in conduct or knowingly placed L.A.C. with persons who engaged in conduct which endangered his physical or emotional well-being,[8] the jury and trial court also found by clear and convincing evidence that Appellant had

---

[3]... Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005).

[4]... *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

[5]... We note that neither the jury nor the trial court made a finding under subsection (D).

[6]... *See* Tex. Fam. Code Ann. § 161.001(1)(E), (2) (Vernon 2008).

[7]... *See, e.g., N. Dallas Diagnostic Ctr. v. Dewberry*, 900 S.W.2d 90, 97 (Tex. App.—Dallas 1995, writ denied) (refusing to consider evidence held inadmissible in factual sufficiency review).

[8]... *See* Tex. Fam. Code Ann. § 161.001(1)(E).

previously had her parent-child relationship terminated with respect to another child based on an endangerment finding under subsection (D) or (E), a ground for termination under subsection (M).[9]

Appellant does not challenge the evidence supporting the finding under subsection (M) in her opening brief. She argues within her sufficiency issue discussion in her reply brief for the first time that the prior termination order is irrelevant and that the trial court erred by considering the evidence of the prior termination. Neither argument was preserved at trial. Additionally, Appellant still does not challenge the sufficiency of the evidence supporting the finding under subsection (M), and we note that she does not challenge the validity of subsection (M). In the interest of justice, we point out that the evidence supporting the finding under subsection (M) is legally and factually sufficient—a certified copy of the termination decree terminating Appellant's parental rights to L.A.C.'s two older sisters was admitted into evidence,[10] as well as testimony concerning that termination—and Appellant did not object or offer conflicting evidence.

---

[9] *See id.* § 161.001(1)(M).

[10] *See In re J.M.M.*, 80 S.W.3d 232, 243 (Tex. App.—Fort Worth 2002, pet. denied).

4

Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination.[11] Because we uphold the finding under subsection (M), we need resolve only whether the evidence is legally and factually sufficient to support the best interest finding.[12]

Appellant admitted that she is an addict. Appellant, who was thirty-eight years old at the time of trial, began using marijuana when she was thirteen or fourteen years old. When asked, she did not remember whether she again used marijuana in 2003. She used methamphetamine in 2004, 2005, and 2006.

Appellant testified that in December 2005, two of her young daughters, one a newborn, tested positive for methamphetamine. In January 2006, Appellant tested positive for methamphetamine. She admitted at trial that she had begun using close to a year before that test and that she had used methamphetamine every weekend during her pregnancy with that newborn daughter. Appellant testified that her boyfriend, the father of those daughters and L.A.C., gave her the drugs and used them on the weekends as well. Appellant testified that she stayed clean for a little while during the CPS case

---

[11] *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

[12] *See In re B.K.D.*, 131 S.W.3d 10, 16 (Tex. App.—Fort Worth 2003, pet. denied).

involving her two young daughters but used methamphetamine again after less than four months' sobriety. Appellant admitted that after she relapsed, she did not complete the outpatient drug rehabilitation program, she did not attend Alcoholics Anonymous (AA) or Narcotics Anonymous (NA), she did not go to counseling, she was not working, and her boyfriend was paying the bills. She testified that unlike her, he was not using drugs during that period.

In March 2006, while the prior CPS case was still pending, Appellant was arrested for possession of a controlled substance and received four years' deferred adjudication community supervision. She testified that she had sold half of her boyfriend's methamphetamine to pay bills. In August 2006, Appellant was arrested again; her two young daughters were with her. At the time of her arrest, she was using methamphetamine, and the police found a methamphetamine pipe in her hotel room. CPS then filed a petition to terminate her parental rights to her two young daughters. Appellant testified that she was again offered services, and she "got most of them done" but did not complete them. Her boyfriend did not complete any services.

In October 2006, Appellant spent some time in jail for her failure to attend a court hearing. She used methamphetamine again on October 19, 2006. She was arrested that day, and she testified that she had not used methamphetamine since that day.

6

When under the influence of methamphetamine, Appellant stayed up for more than a two day period over the weekends; the longest she stayed up was about three days. Appellant testified that she probably made worse decisions when under the influence of methamphetamine.

In November 2006, the trial court modified Appellant's community supervision terms to send her to a treatment facility to address her methamphetamine use. She did not complete that program. According to her testimony, the treatment center could not deal with her medical issues, including her high-risk pregnancy with L.A.C., diabetes, and blood pressure. After she left that program, she started going to an outpatient program four days a week.

Appellant admitted that she did not seek prenatal care during the first four months of her pregnancy with L.A.C., despite having had prior high-risk pregnancies. When she did seek care, it was at the high-risk pregnancy center in Parkland. She testified that she told the hospital personnel that she was smoking marijuana while pregnant. In December 2006, she tested positive for marijuana.

She recalled using marijuana again when she really wanted to use methamphetamine but could not remember if that event occurred in February 2007, the month in which the State moved to proceed to adjudication on her

7

March 2006 arrest. She admitted testing positive for marijuana on March 29, 2007, in May 2007, and in July 2007 at L.A.C.'s birth. She testified that at that time, she was smoking marijuana "maybe once a month, every three weeks," and that "[p]eople gave it to" her. She testified that she had stopped going to NA and AA in her eighth month. Appellant denied using or being around other people using methamphetamine from March 2007 to July 2007.

Appellant stated that even though she knew that marijuana was illegal and that she took risks to use it, especially while on deferred adjudication community supervision, she used it because she did not want to use methamphetamine and did not want anything to happen to her baby. She had never heard of anyone getting hurt from marijuana. Appellant testified that marijuana made her hungry, but she did not want to eat when she was pregnant. It made her laugh, and it made her happier when she felt depressed. She did not believe that it affected her decision-making. She admitted, however, that her older son's issue with marijuana got him into criminal trouble. Appellant stated that she used marijuana during the time she attended NA and outpatient drug therapy. On cross-examination, she admitted, "Alcohol, marijuana, meth, it's all the same. . . . It all is mind altering. It's all addictive."

The CPS caseworker for Appellant's case involving her two young daughters testified that Appellant had not participated in any of her services as

of May 2007. In June 2007, Appellant's parental rights to her two young daughters were terminated; Appellant did not attend that trial. Some testimony at the trial involving L.A.C. indicated that Appellant had been sick during the earlier trial.

L.A.C. was born in July 2007. Even though Appellant tested positive for marijuana, his test results were negative. L.A.C. was removed from Appellant's care and taken directly to a foster home from the hospital.

When asked, Appellant answered that she did not know whether her smoking marijuana during the pregnancy affected L.A.C. Appellant testified that she had used methamphetamine during her prior pregnancy with L.A.C.'s sister and had quit because using while pregnant made Appellant sick. Appellant stated that she was sure that using methamphetamine during a pregnancy affects the child. She claimed that she did not see any physical effects in her young daughters but that she knew they missed her. She agreed that they had been emotionally endangered as a result of her choices. She also testified that she had never been a "real mom" to them because she was using drugs. She stated that she had let them down; she had not provided for them, taken care of them, or given them the attention they needed.

Appellant admitted that she had knowingly wronged L.A.C. by using drugs during her pregnancy with him and by not being in his life at the time of

9

trial—"not providing for him" and "not loving him." She admitted that using drugs during the pregnancy "could have affected his health" and endangered him physically. She admitted that as a result of her choices, L.A.C. was not getting to know his mother. She agreed that her "current situation and the choices [she had] made up to [the time of trial] have been emotionally endangering to [L.A.C.]"

Appellant testified that after L.A.C.'s birth but during his extended hospital stay, she bonded with him. She testified that she had decided that she wanted to stay clean and that she wanted her children back but that this time she actually did something toward her goal. She began services again. She testified that she completed her drug and psychological evaluations, attended NA six or seven days a week, and attended drug outpatient therapy and was four weeks short of completing it when, in November 2007, she was convicted and sentenced to one year's confinement based on her March 2006 arrest. She stated that she had started going to church and was saved and baptized a week before her incarceration. A CPS caseworker testified that before her incarceration, Appellant visited L.A.C. regularly for the most part, she attended New Day Counseling outpatient treatment and NA, and she completed parenting classes.

Appellant was still confined at the time of trial. Appellant admitted that her confinement was based on decisions she had made. She testified that while in jail, she was currently working on Steps 11 and 12 of NA or AA and that she had taken a parenting class, anger management, and a drug counseling program while in jail.

While Appellant denied any drug use since L.A.C.'s birth in July 2007, she admitted that the majority of her period of sobriety had been spent incarcerated. When asked, "Would you agree with me that there's a big if as to whether or not you're going to maintain your sobriety once you're released from the jailhouse?", she responded, "Only God knows."

Appellant testified that her release date would be November 5, 2008, that she did not have a home for L.A.C. at the time of trial, that she was still in the long-term process of recovery, and that

> Right now in my recovery, I don't think I'm ready for him to come back. I just wanted a chance for a visitation and an extension on my services or something, anything, because I know I need to — I know I need to work on myself. I need to get a job. I need to get a place to live. I need to continue my NA. I need to continue working on my steps.

She testified that if she had to pick a date when she would be ready for L.A.C. to come to her home, it would be "[a] while." Appellant testified, "I have to work on myself first and get my life together and continue my recovery, get a

good job, be able to provide for him. I know it's not going to be quick, maybe one or two years." Appellant planned to leave L.A.C. in her cousin's home if termination did not occur; she believed that even after she got her life together, she would just ask to be in his life. She admitted that having L.A.C. wait on her time line would not be fair to him. She also agreed that his waiting and not knowing where he's going to be or not knowing if he's going to move to a whole new home "[p]robably wouldn't" be in his best interest. But she stated that it was in L.A.C.'s best interest for her rights not to be terminated so he could "get to know his real mother" and that it would benefit him to get to know her because she believed that "family should stay together."

Appellant had not had a full-time regular job since before she started dating L.A.C.'s birth father thirteen years before trial. The CPS caseworker stated that Appellant did not demonstrate any ability to maintain stable employment or suitable housing. Appellant agreed that from the beginning of the case involving L.A.C., she had understood that she had to prove certain things to make sure that she had a stable home for him to come home to, and she testified that she did not believe that she had been able to prove those things.

The CPS caseworker testified that termination of Appellant's parental rights is in L.A.C.'s best interest because he deserves permanency, security,

12

stability, and "to know that somebody is going to be there at all times to care for him and to provide him with his basic needs, his food, clothing, and shelter and not somebody who is going to skip out of his life periodically as [Appellant] has done." Because he is only a year old, the risk of returning L.A.C. to Appellant is greater, the caseworker testified; he is more vulnerable because he cannot speak for himself, help feed himself, or make an outcry if necessary. The caseworker testified that the State "feels that [Appellant] has not been able to make significant progress from the services that have been offered to her. She has not been able to demonstrate stability in her life or she's not been able to show that her pattern of behaviors in the past ha[s] changed." The caseworker explained that it is easier to maintain sobriety in an institutional setting, and that the State has had no time to evaluate Appellant to see if she's going to maintain her sobriety or benefit from any skills that she learned in her classes in jail.

After Appellant's incarceration, the CPS caseworker saw her at hearings but otherwise had no direct contact with her; the caseworker did not visit Appellant in jail.

The State's plan for L.A.C. if the jury terminated Appellant's rights was adoption by Appellant's cousin. The caseworker testified that the cousin and L.A.C. have bonded. Appellant's cousin testified that L.A.C. has been in her

13

home for more than six months, that he is healthy and happy, that he has a routine, that he is attached to her, her husband, and their children, and that he visits once a month with his siblings and maternal grandmother. Appellant's cousin testified that she and her husband love L.A.C. like their biological children and that they want to adopt him. She also testified that she would be open to supervised visitation between L.A.C. and Appellant if Appellant were off drugs and able to overcome her addiction. Appellant had no concerns or issues about L.A.C. living with her cousin and her family; Appellant testified that her cousin is a very good mother and that her cousin's family is "a good family."

Applying the appropriate standard of review[13] but ignoring the evidence regarding Appellant testing positive for methamphetamine after L.A.C.'s birth, we hold that the evidence is legally and factually sufficient to support the best interest finding and that the evidence is therefore legally and factually sufficient to support termination. We overrule Appellant's second issue. Because we hold the evidence legally and factually sufficient without considering the

---

[13] ... *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (providing legal standard of review); *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (both providing factual standard of review); *see also* Tex. Fam. Code Ann. § 263.307(a), (b) (Vernon 2008); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

evidence regarding the methamphetamine test results, we consequently hold that the error, if any, in the admission of such evidence was harmless.[14] We overrule Appellant's first issue.

II.  The trial court did not abuse its discretion by denying a continuance.

Five days before trial began, Appellant moved for a continuance on the termination proceedings to "provide additional time to continue her efforts toward recovery."  She wanted time to serve out her sentence and find stable employment and suitable housing.  The trial court denied Appellant's motion the day before trial and again near the end of trial when she re-urged it.  In her third issue, Appellant contends that the trial court abused its discretion by denying the continuance.

We review a trial court's ruling on a motion for continuance for an abuse of discretion.[15]  We do not substitute our judgment for that of the trial court.[16]  Instead, we must determine whether the trial court's action was so arbitrary

---

[14] *See* Tex. R. App. P. 44.1(a); *Romero*, 166 S.W.3d at 225.

[15] *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002).

[16] *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding).

15

and unreasonable as to amount to a clear and prejudicial error of law.[17]  The test is whether the trial court acted without reference to guiding rules or principles.[18]

In a termination case, a trial court may not keep the cause on its docket after the Monday following the rendition of the first temporary order unless the trial court finds that extraordinary circumstances require an extension of no more than 180 days.[19]  Even with an extension, trial here could have been delayed only approximately six and one-half months beyond the date the trial actually occurred.[20]  Appellant testified that she expected to be released from jail in early November 2008, more than three months after the actual trial date and around three months before the last possible date of trial.  Her service plan goals required that she establish and maintain safe, suitable, and stable housing and suitable employment for at least *six* months.  At the time of trial, Appellant had no plan for housing or work.  We note that the jury was not asked to rely

---

[17] *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004).

[18] *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

[19] *See* Tex. Fam. Code Ann. § 263.401 (Vernon 2008).

[20] *See id.*

on Subsection (O), which provides as a ground for termination the parent's failure to follow a court-ordered service plan.[21]

Additionally, given the trial court's awareness of Appellant's prior, recent CPS experience and Appellant's testimony that it could take "maybe one or two years" before she could be in a position to raise L.A.C., that "only God knows" whether she could maintain her sobriety after her release from jail, and that she relapsed after less than four months' sobriety during the prior CPS case, we cannot conclude that the trial court abused its discretion by denying either the original or renewed motion for continuance. We overrule Appellant's third issue.

III. Conclusion

Having overruled Appellant's three issues, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL: LIVINGSTON, DAUPHINOT, and GARDNER, JJ.

DELIVERED: December 10, 2009

---

[21] ... *See* Tex. Fam. Code Ann. § 161.001(1)(O) (Vernon 2008).