

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-09-125-CV

IN THE INTEREST OF S.A.G.,
E.J.G., AND N.S.G., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### Introduction

Appellant A.G. appeals the trial court's order terminating her parental rights to her children S.A.G., E.J.G., and N.S.G.[2] In two points, A.G. contends that the evidence presented at trial was legally and factually insufficient to support two of the trial court's three statutory termination findings and was

---

[1] *See* Tex. R. App. P. 47.4.

[2] To protect the privacy of the parents and children involved in this appeal, we identify them by initials only. *See* Tex. R. App. P. 9.8(b); Tex. Fam. Code Ann. § 109.002(d) (Vernon 2008).

factually insufficient to prove that termination of the parent-child relationship was in the children's best interests. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (M) & (2) (Vernon Supp. 2009). We affirm.

**Background Facts**

Appellant A.G. (Mother) is the biological mother, and her husband C.S.G. (Father) is the presumed biological father, of S.A.G., E.J.G., and N.S.G., the three children who are the subject of this suit. Mother and Father were married on March 20, 2005. Daughter S.A.G. was born on August 18, 2005, son E.J.G. was born on June 8, 2006, and son N.S.G. was born on September 22, 2008, after this suit had been filed.

In March 2008, the Texas Department of Family and Protective Services (the Department) received allegations that Mother and Father had neglectfully supervised and physically abused S.A.G. and E.J.G. A Department caseworker investigated and observed S.A.G. and E.J.G. strapped to and hanging over their high chairs, screaming and crying. Mother admitted to the caseworker that she had left both children in their high chairs while she and Father slept and that she has screamed and cursed at the children. Mother told the caseworker that she was not able to care for S.A.G. and E.J.G. at their current ages but that she was able to take care of babies. Mother was the children's sole care

2

provider for six to eight hours per day while Father worked outside the home as a driver and helper at Pizza Hut.

Mother's extensive history with the Department began when she was a child. In 1988, Mother was removed from her mother and placed in foster care after being physically abused by her mother and sexually abused by her mother's boyfriends. Mother became involved with the Department in 2000 regarding her own children. In November 2003, a court involuntarily terminated Mother's parental rights to her third child, born in April 2003, based on child endangerment findings under Texas Family Code section 161.001(1)(D), (E), and (N). Mother testified that she was dealing with "mental issues" at the time, was not taking her medications, and alternated between living on the streets and in her own apartment.

The Department removed S.A.G. and E.J.G. from Mother and Father's home, placed them in foster care, and filed suit in April 2008 for the children's protection, for temporary managing conservatorship, and for termination of Mother's and Father's parental rights.

In September 2008, N.S.G. was born prematurely at thirty-three weeks. The Department became involved with N.S.G. because S.A.G. and E.J.G. had been removed and due to concerns about Mother's abuse of prescription

medications. At the time, Mother was taking hydrocodone[3] every four to six hours for back pain and Tegretol for her seizure and bipolar disorders. During the investigation, Mother reported that a nurse had been concerned with her abuse of hydrocodone during her pregnancy, but Mother denied the abuse. Mother also stated that Tegretol caused sleepiness, and that she planned to use a baby monitor to hear the baby crying and an alarm clock to time her naps while the baby was sleeping. Also during the Department's investigation, Mother admitted that she and others called law enforcement to her home approximately twenty to thirty times due to arguments with her husband, among other reasons.

At the end of its investigation regarding N.S.G., the Department found reason to believe the allegation of neglectful supervision but ruled out the allegation of physical neglect. The Department amended its petition regarding S.A.G. and E.J.G. to add N.S.G. Upon Father's motion, the trial court ordered S.A.G., E.J.G., and N.S.G. placed with the children's paternal grandmother, M.L.

---

[3] We take judicial notice that hydrocodone is "a potent analgesic derivative of codeine." Stedman's Medical Dictionary 911 (28th ed. 2006); *see* Tex. R. Evid. 201(b), (c) (stating that a court may take judicial notice of adjudicative facts, including facts that are "not subject to reasonable dispute" in that they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

4

In June 2008, the trial court approved and adopted the Department's service plan for Mother and Father. Under the service plan, Mother and Father were required to maintain safe and appropriate housing, submit to a screening conducted by the Texas Mental Health and Mental Retardation (MHMR) Department and follow all recommendations from the screening, attend couples' counseling sessions and parenting classes, submit to random drug screenings, participate in a psychological evaluation and follow all recommendations from the evaluation, and visit the children weekly.

Child Protective Services (CPS) ongoing caseworker Elizabeth Bowlen reviewed Mother's service plan with her on multiple occasions. Although Mother began parenting classes, she did not complete them because she was unable to make her appointments while in the hospital giving birth to N.S.G. Mother completed her MHMR screening and MHMR made no recommendations. Mother and Father maintained safe and appropriate housing. They both attended couples' counseling sessions and submitted to random drug screenings when requested and no illegal drug use was indicated. Mother also participated in a psychological evaluation as required under her service plan. Following the psychological evaluation, Bowlen met with Mother and encouraged her to continue to attend therapy to address issues surrounding the abuse and neglect Mother experienced as a child and to address anger management issues.

5

In November 2008, after N.S.G.'s birth, Mother told Bowlen on two separate occasions that she might want to relinquish her parental rights to the children because she did not think that she could care for them. Mother maintained her opposition to termination, however, based on her belief that she and her children deserved to be together as a family. Also in November 2008, Mother called Bowlen stating that she had sought help with postpartum depression at the Women's Center but that the doctor would not prescribe her medication.

On February 9, 2009, approximately one month before trial, Mother sought treatment at Parkland Hospital in Dallas after being referred there by her neurologist. At Parkland, she was told that her blackouts were caused by psychotic episodes, not epilepsy as previously diagnosed. After receiving this revised diagnosis, Mother thought about taking her life by driving Father's car into the river but changed her mind because she loved her children and believed they and Father needed her. Mother did not seek mental health services following her thoughts of suicide, and she disagreed with the diagnosis that she was suffering from depression at the time of trial.

This case was tried to the bench on March 10, 2009. The evidence indicated that, in addition to the diagnosis of having blackouts caused by psychotic episodes, Mother previously had been diagnosed with bipolar

6

disorder, sleep disorder, depression accompanied by thoughts of suicide, scoliosis, asthma, high blood pressure, a heart murmur, and seizures. At the time of trial Mother was taking Cymbalta for depression and bipolar disorder, Ambian CR for a sleep disorder, Albuterol for asthma, and high blood pressure medication. Mother testified that she had been prescribed Tegretol and Keppra for seizures in the past but that she no longer was diagnosed with a seizure disorder and was no longer taking seizure medication. Mother also had taken prescription hydrocodone, Ibuprofen, Tylenol, and Excedrin for pain management, Zoloft, Paxil, Depakote, Dilantin, and Pulmicort.

Father testified that Mother's IQ is not very high.[4] Mother admitted problems with memory lapses, but she did not recall when they began. She stated that her memory problems did not affect her parenting and that she has never forgotten to feed her children or change their diapers. Mother reported becoming agitated during her psychological evaluation because she was not able to remember instructions and perform the assigned tasks.

Mother admitted that she experienced blackouts, but disagreed with the diagnosis that they were caused by psychotic episodes. She did not recall blacking out while caring for S.A.G. and E.J.G. by herself. Mother also testified

_____

[4] No evidence was introduced regarding the administration of any formal IQ testing or any such test's results.

7

that she only knew when she had blacked out if Father told her, and that otherwise she was not aware of blacking out in the past. Mother stated that her blackout spells would not impact her ability to take care of her three children because she would be able to rely upon Father's support.

Mother testified that she has been depressed in the past and that she had fallen short as a parent due to her depression; specifically, she had yelled and cussed at her children. Mother testified that she was working on this issue and doing better.

Mother denied abusing prescription drugs, stating that she always took her medication as prescribed. She testified that she had a history of taking hydrocodone as frequently as every four to six hours for back pain. Mother admitted that, in the months before trial, she had obtained more than three prescriptions for hydrocodone for her back pain and finished a one-month supply of hydrocodone in fifteen days. Mother also stated that she discussed this case with her family physician, and he stated that they would "lower [her] medication to where [she is] more stable enough to care for the children" if they were returned to her.

Father never knew Mother to harm the children and had no concerns about her ability to provide for their physical needs. He stated, however, that he thought she was in need of counseling for depression as recently as one

8

month before trial.  Father also stated that, if the children were returned to him and Mother, he would seek help from a nanny so that they can work themselves back into caring for small children.  Mother also told the court that she would prefer to have a nanny with her when her husband was at work.

At trial, the Department also introduced a certified copy of the November 2003 order of termination of Mother's parental rights to her third-born child, K.L.J.  Mother's rights to K.L.J. were terminated involuntarily upon court findings that Mother had knowingly placed or knowingly allowed her to remain in conditions or surroundings which endangered her physical or emotional well-being, engaged in conduct or knowingly placed her with persons who engaged in conduct which endangered her physical or emotional well-being, and constructively abandoned her.[5]  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), & (N) (Vernon 2008 & Supp. 2009).

At the end of this trial, the court terminated Mother's parental relationship with the children.[6]  The trial court found that Mother (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which

---

[5] In March 2002, Mother voluntarily relinquished her rights to her first child, born in November 2000.  In December 2002, Mother voluntarily relinquished her rights to her second child, born in April 2002, because Mother did not think that she could meet the child's daily needs.

[6] The trial court did not terminate Father's parental rights.

9

endangered their physical or emotional well-being, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being, and (3) had previously had her parent-child relationship terminated with respect to another child based on an adverse finding regarding these previous two standards. *Id.* § 161.001(1)(D), (E), & (M). The court also found that termination of Mother's parental relationship with the children was in their best interests. *Id.* § 161.001(2). The court named the Department managing conservator, Father joint possessory conservator with right of reasonable access and possession, and M.L. and C.L. (Father's parents) joint possessory conservators with primary right of possession. The trial court also ordered Father, M.L., and C.L. not to allow Mother to have contact with the children or allow the children to enter Father's residence while he resided with Mother. Mother timely filed this appeal.

**Standard of Review**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are

10

not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

11

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (Vernon 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

**Endangerment**

In her first issue, Mother contends that the evidence is legally and factually insufficient to support the trial court's endangerment findings under subsections 161.001(1)(D) and (E) of the Texas Family Code.

Along with a best interest finding, a finding of only one ground alleged under family code section 161.001(1) is sufficient to support a judgment of termination. *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). Although Mother appeals the court's findings under subsections (D) and (E), she fails to challenge its finding under subsection (M) that her parental rights to a different child had previously been terminated under subsection (D) or (E). The record includes a certified copy of the November 25,

12

2003, Order of Termination of Mother's parental rights to K.L.J., the children's half-sister, based on endangerment findings under subsections (D), (E), and (N). Therefore, we hold that the trial court had a legally sufficient basis to support termination under section 161.001(1)(M), and we need not address Mothers' challenge to the findings under (D) and (E). *See Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 64 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *see also In re B.K.D.*, 131 S.W.3d 10, 16 (Tex. App.—Fort Worth 2003, pet. denied) (explaining that "to be successful on appeal, the appellant must establish that the . . . findings on all of the [Department's] pleaded grounds are unsupported by the evidence"); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.—El Paso 2000, no pet.) (holding that, because the appellant "failed to challenge the legal or factual sufficiency of the evidence with regard to [one of the statutory provisions], the first element of involuntary termination c[ould] be affirmed based on th[at] provision"). We overrule Mother's first issue.

## Best Interests of the Children

In her second issue, Mother contends that the evidence is factually insufficient to support the trial court's finding that termination of her parental rights was in the children's the best interests under subsection 161.001(2) of the Texas Family Code.

13

**Factual Sufficiency Review**

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated at least one conduct provision of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**Best Interest Factors**

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008). The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

14

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and

(F) an understanding of the child's needs and capabilities;  and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

16

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Although termination may not be based solely on the best interest of the child as determined by the trier of fact, *Boyd*, 727 S.W.2d at 533, the same evidence may prove both a subsection 161.001(1) endangerment finding and a finding under subsection 161.001(2) that termination is in the best interest of the child. *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001.

17

**Analysis**

**Mother's parental abilities**

CPS caseworker Bowlen testified that Mother and Father's "physical house was safe and appropriate." *See* Tex. Fam. Code Ann. § 263.307(b)(12)(D) (considering a parent's ability to provide a "safe physical home environment"). Father testified that he thought Mother was an able parent, he never knew Mother to harm their children, and he had no concerns about her ability to provide for their physical needs. He handled most of the cooking, he and Mother shared responsibilities for washing and bathing the children, and Mother was disciplined about washing their clothes, sterilizing their bottles, and measuring their bottles.

However, evidence indicates that Mother did not demonstrate adequate parenting skills. *See id.* § 263.307(b)(12); *Holley*, 544 S.W.2d at 371–72. Mother has a past history of not being able to provide her children with a safe environment, as established by the termination of her parental rights to another child based on endangerment and abandonment findings. Mother also voluntarily relinquished her parental rights to her first two children, in one instance because she did not think that she could meet the child's daily needs. Additionally, Mother's recent history establishes that her parental abilities are deficient, including her use of hydrocodone more frequently than prescribed and

18

the fact that she told a Department caseworker that she had left both children in their high chairs while she and Father slept, that she screamed and cursed at the children, and that she was not able to care for S.A.G. and E.J.G. at their current ages.

Mother also failed to take steps toward improving her parenting skills by completing the parenting classes required under her service plan. According to Father, Mother's pregnancy with N.S.G. prevented her from attending the classes. Neither Father nor Mother, however, offered any reason why Mother was not able to resume and complete parenting classes in the months between N.S.G.'s birth and the trial date.

**Emotional and physical needs of and danger to the children**

Mother admitted to having blackouts but stated that her blackouts would not impact her ability to take care of her three children. However, the trial court reasonably could have concluded that Mother had blacked out while acting as the children's sole care giver and that these occurrences put the children in danger.

Mother told the court that she had thought about committing suicide in the weeks before trial. She also admitted that she was depressed in the past and that she yelled and cussed at S.A.G. and E.J.G. while dealing with her depression. Mother told the court that she was working on her yelling and

19

cussing and doing better. Father testified that Mother sometimes cussed when frustrated at the children but he did not think Mother had a "serious" anger management problem.

Mother also had an ongoing pattern of memory problems that impacted her parenting in the past. Mother told the court that there were a "lot of times" when Father reminded her of things she seemed to have forgotten. She testified, however, that she has never forgotten to feed her children or change their diapers when wet and that she did not remember experiencing any problems remembering things regarding her care for S.A.G. and E.J.G. Yet Mother voluntarily relinquished parental rights to her second-born child, J.J., after she "accidently forgot" to give him medication. More recently, Mother admitted that she became agitated and frustrated during her psychological evaluation because she was not able to remember the instructions given and perform the tasks assigned.

Mother denied abusing prescription drugs. However, she told the court that she had a history of taking hydrocodone as frequently as every four to six hours for back pain; that, in the months before trial, she had obtained more than three prescriptions for hydrocodone for her back pain; and that she finished one prescription for a month's supply of hydrocodone in fifteen days.

Mother also reported that a nurse talked to her about concerns that Mother abused hydrocodone while pregnant with N.S.G.

Mother contends that there was no evidence introduced at trial that S.A.G., E.J.G., or N.S.G. were harmed by her or as a result of her mental health issues. The evidence indicated, however, that Mother's blackouts, thoughts of suicide, depression, memory problems, and prescription drug use hindered her ability to care for the emotional and physical needs of, and posed emotional and physical danger to, the children now and in the future. *See Holley*, 544 S.W.2d 371–72; *see also In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("[T]he trial court could have considered [the mother's] mental state [recurrent depression, thoughts of hurting herself, borderline personality disorder, post-traumatic stress disorder, attention deficit hyperactivity disorder, and seizures] as endangering [the child's] well-being."); *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ) ("While mental incompetence or mental illness alone are not grounds for termination of the parent-child relationship, when a parent's mental state allows him to engage in conduct which endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights."); *In re E.A.W.S.*, No. 02-06-00031-CV, 2006 WL 3525367, at *18 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.) (holding

21

that mother's "instances of mental instability and agitation, including threatening behavior and suicidal ideation" supported termination).

**Any excuse for Mother's acts or omissions and Mother's willingness and ability to effect positive environmental and personal changes**

Mother did not offer any evidence by way of an excuse for her acts or omissions, stating on appeal that her mental condition is involuntary. *See Holley*, 544 S.W.2d 372. Mother did not offer any excuse for her history of failing to seek or accept assistance for her mental health condition and repeatedly discounting the harm her mental condition posed to her children. *See id.*

Mother has a history of refusing help for her mental condition. Approximately one year before trial, Mother declined mental health services and medication offered by Adult Protective Services (APS). At trial, Mother stated that she declined APS's offer because she did not feel that she would benefit from the services provided, but that she later had come to regret that decision and that she "probably" had problems seeing after her own needs.

Mother also showed a pattern of minimizing the severity of her own mental condition. She stated that she did not believe she suffered from "psychotic spells" despite receiving that diagnosis approximately one month before trial. And, although Mother contemplated suicide in the weeks before

22

trial, she said that she did not seek professional medical attention afterward because, in her words, "I've been told I'm crazy and I'm not." Mother denied that she suffered from depression at the time of trial.

Mother also minimized the harm that her mental health condition had on the care she was able to provide her children. She denied the possibility of ever blacking out while the children were in her care. Even though she admitted to memory problems, Mother testified that she did not remember experiencing any problems remembering things regarding her care for S.A.G. and E.J.G. and that she never forgot to feed her children or change their diapers when wet.

Testimony established that Mother had taken some steps to address her mental health condition. At the time of trial, Mother was taking her depression, bipolar, and sleep disorder medication as prescribed and had attended therapy sessions as part of her service plan. But Mother did not accept that she was depressed at the time of trial, did not seek help after contemplating suicide less than one month before trial, did not accept that her blackouts were caused by psychotic episodes as diagnosed, and did not take steps to address the danger posed to her children in the event she blacked out while caring for them. Accordingly, evidence supported the conclusion that Mother was unwilling and unable to effect positive environmental and personal changes regarding her mental health and parenting. *See* Tex. Fam. Code Ann. § 263.307(b)(11).

23

**Children's desires**

The children were three years, two years, and five months old at the time of the termination trial and did not specifically express their desires. Testimony at trial indicated that the older two children had bonded with Mother and that Mother was working toward building a bond with the youngest, N.S.G., despite the fact that they never lived together.

**Stability of the home**

Evidence indicated that Mother was not able to offer the children a stable home until after receiving adequate mental health care. CPS caseworker Bowlen testified without objection that Mother had not yet worked through issues of her own abuse and neglect as a child, that Mother could not take care of small children without twenty-four-hour help, and that, if Mother's parental rights were not terminated, she still probably would need "many years to work through a lot of her childhood issues" before being able to care for the children.

**Plans for the children**

Father thought that, if the children were returned to him and Mother, they would seek help from a nanny so that they could work themselves back into caring for small children. Mother similarly testified that she would prefer to have a nanny with her when she cared for the children while Father was at work. Father stated that they were able to afford paying a nanny $100 to

24

$150 per week; Father earned approximately $470 per week in wages plus tips.

The Department planned to have the children's paternal grandparents, M.L. and C.L., eventually adopt all three children. M.L. had agreed to take early retirement to care for them. Mother herself recommended that M.L. adopt the children if Mother could not keep them, stating that M.L. is a "very good person and she's been doing it." Father also preferred that the children be placed with M.L. if they could not be returned to him, and he was confident that M.L. was doing a good job with them.

**Our holding**

On the entire record and considering Mother's history of blackouts, her rejection of the diagnosis that they are caused by psychotic episodes, her denial that she ever blacked out while caring for her children, and her failure to address the danger to her children in the event she blacks out while they are in her care; Mother's depression and thoughts of suicide less than one month before trial, her failure to seek medical attention for depression and suicidal thoughts thereafter, her refusal to accept the diagnosis that she was suffering from depression at the time of trial, and the testimony from CPS caseworker Bowlen that Mother may not be able to care for her children for some time even if she diligently works toward addressing her mental health issues; and the

25

children's need for stability and the stability offered by the Department's plans for the children to be adopted by their paternal grandparents, we conclude that the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in the children's best interests. Giving due deference to the trial court's determination, we hold that the evidence is factually sufficient to support the trial court's judgment that termination of Mother's parental rights was in the children's best interests. *See C.H.*, 89 S.W.3d at 28. We overrule Mother's second issue.

**Conclusion**

Having overruled both of Mother's issues on appeal, we affirm the trial court's order terminating Mother's parental rights to S.A.G., E.J.G., and N.S.G.


TERRIE LIVINGSTON
JUSTICE


PANEL: LIVINGSTON, GARDNER, and MEIER, JJ.

DELIVERED: March 18, 2010

26