# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00258-CV

**R. P., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

**FROM THE DISTRICT COURT OF LAMPASAS COUNTY, 27TH JUDICIAL DISTRICT NO. 18,072, HONORABLE JOE CARROLL, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

R.P. appeals from the judgment terminating her parental rights. After a trial before the associate judge, the jury found that appellant[1] had committed acts and omissions that supported termination and that termination was in the child's best interest. After a de novo hearing, the district judge made findings of fact and conclusions of law consistent with the jury's findings. Appellant contends that the evidence was legally and factually insufficient to support findings that (1) appellant knowingly placed or knowingly allowed her child to remain in conditions or surroundings that endangered the child's emotional or physical well-being, (2) appellant engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being, (3) appellant failed to comply with the provisions of the court order that established the conditions under which her child could return to her, and

_____

[1] Because mother, father, and child all have the initials "R.P.," for clarity we will refer to them respectively as appellant, Robert, and child.

(4) termination of the parent-child relationship is in the best interest of the child. We will affirm the judgment.

**Background**

Appellant is the mother of two daughters by different fathers, only the younger of whom is part of this case.[2] The younger child was in foster care at the time of trial. Her father, Robert, voluntarily relinquished his parental rights at the outset of this trial. Several people testified at trial, including appellant, Robert, his father, persons who provided case-related services to appellant, and police officers. We have reviewed the entire record and will present a distillation of the aspects relevant and useful in resolving this appeal.

*Events leading to removal*

Appellant met Robert in the summer of 2009, started dating him that fall, and gave birth to the child on November 19, 2010. She testified that her relationship with Robert was good at first and that he was really good with her older daughter. She said that he did not show any unstable or violent behaviors until she became pregnant with their child.[3]

Appellant testified that, during the later stages of her pregnancy, Robert became possessive and jealous, limiting her contact with other people. In August or September of 2010, he started shoving and hitting her. She said that he was escorted away by police "a few times" during

---

[2] The case concerning the other daughter was severed from this case.

[3] Police reports showed incidents involving appellant and Robert on September 7, 2010, November 11, 2010, December 25, 2010, December 27, 2010, January 24, 2011, February 7, 2011, February, 17, 2011, and February 23, 2011. There was also an incident involving appellant on September 3, 2010, and one involving Robert on November 13, 2010.

their relationship and recalled him being arrested three times. She testified that, when she did not want to go to Robert's mother's house for dinner for a holiday—she could not remember whether it was the first Thanksgiving or Christmas after the child was born—Robert hit her in the head and gave her a concussion. She drove him straight to the police station where he stayed in jail. She did not recall a domestic disturbance in January 2011. She married him on February 14, 2011, hoping to improve conditions and to conform with her religious convictions. She did not remember calling the police on February 17, 2011—Lampasas police officer Fidel Morua testified that appellant reported that Robert took her car and threatened to kill her—but did recall the incident that prompted her involvement with CPS less than a week later.

Appellant testified that on February 23, 2011, Robert had stopped taking his medications[4] and stayed out late drinking with friends. When he returned, he and appellant renewed their longstanding argument about his missing the birth of their child. She estimated that the argument lasted about six hours overnight and escalated. While she was bottle feeding the child, Robert struck appellant on the right side of her head. She testified that she put the child down in the middle of their bed surrounded by pillows and went out to defend herself. They fought in the hallway, the kitchen, and the living room. She testified that he hit her and that she tried to stop him, succeeding only when she threw a framed picture at him. It missed, but he stopped hitting her, although she testified that he used some of the broken glass to cut himself on the chest. She had a baseball sized knot on her head, bruised ribs, pulled hair, and a torn shirt. Appellant said that she

---

[4] Appellant testified that she had been told that Robert was diagnosed with bipolar and schizoaffective disorders.

tried to leave, but Robert would not let her. He destroyed her phone, but a neighbor called the police. Appellant testified that her older daughter slept through the fight.

Lampasas police officer Fidel Morua testified regarding his encounters with appellant and Robert. Morua said that appellant had a history of filing charges against Robert and then dropping them. In July 2010, appellant reported that Robert had stolen her cell phone. Morua testified that, on February 17, 2011, he told appellant that getting a protective order against Robert would be pointless if she was just going to continue being with Robert.

Morua also responded to appellant's call around 6 a.m. on February 23, 2011. He said that he found appellant yelling and upset and Robert bloody and unwelcoming. His testimony about appellant's report to him that day conformed with her testimony at trial, except that appellant's older daughter, then six years old, told Morua that she awoke during the fight, came out, and saw Robert standing over appellant, holding her hair and holding her down on the ground. Morua arrested Robert for assault and interference with appellant's attempt to make a 911 call.

Appellant testified that she obtained an emergency protective order against Robert and then a two-year order on March 15, 2011. She testified that she did not personally want an order that long, but CPS recommended it. She also testified that she intended to divorce Robert, but that CPS investigator Vicki Cundiff talked her out of it, provided that they satisfactorily completed their services. Appellant said she later got the order modified to allow joint counseling sessions.

Cundiff testified, however, that she did not approve of the modification of the protective order and that it concerned her.

4

*After the removal of the children*

Cundiff testified that, based on Robert's history, reports that he was seen at appellant's home caused her to remove the children on April 21, 2011, even though she did not find Robert there. Appellant conceded that she had been working with Robert on her mobile home, but said that Robert often worked on the house while she was away at work.

Appellant testified that she "messed up really bad" by trying to reconcile with Robert. She was afraid of him and reasoned that it would be safer to stay with him and be on his good side. She hoped he would get back on his medications and "stay sane," but that did not happen.

As part of her service plan, appellant was directed to attend parenting classes; submit to a psychological evaluation; and participate in individual therapy, family therapy with her ex-husbands, and a domestic violence group therapy. She needed to maintain a safe and stable home, visit the children, and stay employed. Although Robert did not participate meaningfully in services, appellant completed protective parenting and two psychological evaluations. She went to two family therapy sessions with her first husband, but he quit after two sessions. She attended individual therapy until her job demands became too great. She was attending correctional officer school and needed a second job to pay for the gas to get to her various therapies. She said she missed two child visits in the eighteen months. Appellant testified that she understood the danger that abuse would harm her children and intended to provide them with a safe environment.

Appellant said she had limited contact with Robert after the children were removed. She saw him at her mother's funeral on March 20, 2011, which he helped pay for. She had him help with repairs intended to make her home better for the children because CPS and CASA did not respond to her request for help. She saw him at church occasionally. She got a court order allowing

him to be at their daughter's surgery, although she denied reports that they acted as if they were a couple at the hospital. She gave him rides and lent him a car so he could attend visitations with their child (although he did not have a driver's license).

Appellant rejected Robert's father's testimony that she saw Robert often at the beginning of the month in order to get the benefit of his disability check. She acknowledged texting Robert's father, but said that her texts thanked him for persuading Robert to relinquish his parental rights. Robert's father testified that her 125 texts in two weeks were unwanted, numerous, and threatening. Appellant said she was merely responding to Robert's father's 200 texts during the same period.

Court appointed special advocate James Mortimer said his main concern in this case was inter-parental violence and its effects on the child, and he testified that appellant's actions did not persuade him that the violence would stop. He said he was concerned by appellant's disregard for rules of child visits. In violation of the rules, she spoke to the older child about the possibility of returning home, spoke to the older child secretively, bribed the older child with toys and gifts, and said very negative things about the older child's father. Mortimer recounted an instance in which appellant found the separate location where he was returning the older child to her father, approached the vehicle aggressively and quickly while yelling at the father, and leaned into the car and made comments to the child who was sobbing as a result. Mortimer testified that visits were then suspended for several weeks. Appellant's actions during the next visit also raised concerns. Mortimer testified that the older child's father reported that the child told him that appellant took her to Austin, where they met a man and his ten-year-old son. After a meal, they went

6

to the man's house, where appellant left the child with the boy while appellant and the man engaged in some other activity.

He also testified that appellant's interactions with Robert raised red flags that were concerning on their own, and even more so when she denied having interactions that Mortimer had witnessed. He was concerned about their appearance at the hospital, not because Robert was there, but because they seemed to have arrived together and left holding hands. Mortimer said he was concerned by the inconsistency between her criticisms of Robert's condition and refusal to take medication on the one hand with her praise of him as a good father on the other.

Robert testified that he and appellant were together as a couple off and on despite the protective order in place after February 23, 2011. They were still having "romantic relations" and he occasionally stayed over at her house throughout the rest of 2011. He denied, however, that he was around when appellant had unsupervised visits with the child. Robert also acknowledged previous domestic violence arrests with his first wife, his cousin, and his former stepmother.

*The Department's plan shifts to termination*

On January 21, 2012, appellant and Robert had an altercation at appellant's house that left them both injured and changed the course of this case. Before this incident, appellant was near getting a monitored return of the child. Although the children were not in appellant's home during this altercation, the event persuaded the Department to opt for termination of appellant's rights. There are different versions of what happened on this critical day.

Appellant testified that Robert came to her house uninvited on the afternoon of January 21, 2012. She said he knocked on the door, yelled and screamed, accused her of having another man with her, and warned that he would do whatever he could to make sure that, if he could

7

not raise their child, she could not either. She reminded him of the protective order and threatened to call the police. She said Robert then broke the door down and assaulted her, bruising her, tearing out hair, and ripping her clothing.

Robert testified that he was at appellant's house overnight by invitation, but they argued in the morning. He said appellant hit him with a lamp, and he broke the door on his way out of the house. The Department's conservatorship worker, Lesa Preece, testified that Robert told her a few days after the incident that he had spent the night at appellant's house, left after an argument, but then pushed in the door to retrieve his cigarettes and telephone. He told Preece that he ripped appellant's jeans pocket trying to get his phone.

Lampasas police officer David Landis testified appellant told him, despite the protective order, Robert had been to her house many times without incident. This time, however, she did not want to see him and he was not happy about that. Appellant told Landis that Robert forced his way into the trailer, tore her clothes, hit her with a closed fist, and took away her phone. She hit him with a lamp and yelled for a neighbor to call 911.

Appellant and Robert both testified that they have not had contact since the January 2012 incident, but there was evidence that appellant was involved in another volatile relationship. Although appellant described Adrian Vega as a longtime friend, Preece said that sources told her that the relationship was romantic. Preece testified that she was told that Vega and appellant fight.

*Therapists' views*

James Shinder is a family therapist who evaluated both Robert and appellant. He testified that Robert was argumentative and uninterested in his anger management classes. Shinder

testified that he felt that Robert was not an accurate informant with respect to his relationship with appellant. Shinder testified that Robert's responses to more than one test indicated his propensity for lying. Shinder testified that appellant also showed a tendency toward dishonesty as well as a low ability to assess risk. For instance, the premarital calls to police show that she should have been aware of the risks of being with him, but she married him anyway. He testified that an ongoing relationship with Robert in January 2012 would demonstrate a blatant disregard for her own safety and that of her child.

Therapist Debbie Mabray testified that she addressed with appellant her choice of abusive men. Mabray testified that she believed that appellant had not continued her relationship with Robert. Mabray said she would not trust Robert as a reliable informant regarding whether he and appellant were in a relationship. Mabray testified that appellant was appropriate and warm when interacting with her child. When she last saw appellant in May 2012, appellant reported having no boyfriend and seemed focused on her goals. Reports of an unknown man living in the house over the summer made Mabray hesitate to maintain her recommendation that appellant regain custody of her children. If there was no man at the house, Mabray would recommend a supervised return, but the possibility of a new relationship gave her some doubt—and she resolved doubt in favor of the safety of the child.

Therapist Roxanne McMillian treated appellant's older child after she was placed with her father. McMillian testified that exposure to instability and family violence can lower a child's IQ and condition her to accept violence against women. She testified that the older child has become more lighthearted and less fearful while living with her father. Although appellant described the child's father as abusive, McMillian testified that she had no concerns about violence in

9

his home. She testified that the child worried about appellant's well-being and feared visits with appellant because of appellant's anger. McMillian said that the older child had taken on the parental role with respect to appellant.

*The trial de novo*

After the jury determined that appellant's parental rights to the younger child should be terminated, appellant sought a trial de novo before the district judge. The trial court admitted the record of the trial before the associate judge, then heard additional testimony from appellant. She had lost her job as a corrections officer due to her absence from work during the trial, but continued working as a home health care aide and nurse's assistant.

Appellant testified that, before this case, she had no CPS involvement except being approved to have custody over her younger brother. She testified that she had no criminal history, no history of drug or alcohol use, and no history of mental health issues.

She testified that the sole basis of the termination was her relationship with Robert, and noted that there was no indication he had ever physically harmed the children. She said she did not know of his mental health problems before she dated him and that she still had not seen a definitive diagnosis. She testified that, in the three months since the August jury trial, she had not had any contact with Robert and that no man lived at her house. She said she had not been involved in a relationship since January 2012.

Appellant testified that she had learned a great deal about protective parenting from her classes and that she would not associate with anyone who had a criminal history, mental illness, or problem with a traumatic childhood. She testified that she had completed all of her services, but

conceded she was behind on child support due to her reduced employment. She testified that she has a room in her home for each child.

Appellant testified that her daughters are closely bonded. She testified that the child recognizes her, plays with her, and calls her "Momma" and her older sibling "Sissy." She testified that the child is also bonded to her other half-siblings on her father's side.

She also testified that, although she had several family members and friends volunteer to be a placement alternative, CPS never conducted a home study of them. She testified that she would have "no problem" with a monitored return of her children. She testified that she believed that she could provide better care for the child than a foster parent would because of their bond and because she knows their medical history. She also testified that the child showed signs of neglect, including bruises and severe rashes, while in foster care. She complained that the caseworker transported the child without a safety seat and left her unattended while looking for her car keys—when the keys turned out to be in the ignition of the unattended car.

The trial court terminated appellant's parental rights and issued findings of fact and conclusions of law consistent with the jury's findings.

**Standard of review**

To terminate the parent-child relationship, the factfinder at trial must find clear and convincing evidence that (1) the parent has engaged in conduct set out as statutory grounds for termination and (2) termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). We will review the sufficiency of the evidence to support these two findings separately.

We review the legal sufficiency of the evidence in a parental rights termination case by considering all of the evidence in the light most favorable to the factfinder's determination,

11

and will uphold a finding if a reasonable factfinder could have formed a firm conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the factfinder's conclusions, we must assume that the jury resolved disputed facts in favor of its finding if it could reasonably do so. *Id.* An appellate court should disregard evidence a reasonable factfinder could have disbelieved or found incredible. *Id.*

When reviewing the factual sufficiency of the evidence in a parental rights termination case, we view all of the evidence in a neutral light and determine whether a reasonable factfinder could form a firm belief or conviction that a given finding was true. *In re C.H.*, 89 S.W.3d at 18-19. We assume that the jury resolved disputed facts in favor of its finding if a reasonable jury could do so, and we disregard evidence that a reasonable jury could have disbelieved or found incredible. *J.F.C.*, 96 S.W.3d at 266. Evidence is factually insufficient only if a reasonable factfinder could not have resolved the disputed evidence in favor of its finding and if that disputed evidence is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

**Analysis**

The law requires a showing of a statutory ground for termination of parental rights as well as that termination is in the child's best interest. Tex. Fam. Code § 161.001.

**Ground for termination**

The jury was asked whether appellant's parental rights should be terminated pursuant to subsections (D), (E), and (O) of section 161.001(1) of the Family Code. Only one statutory ground is necessary to support a termination of parental rights. *See In re A.V.*, 113 S.W.3d 355,

12

362 (Tex. 2003). Therefore, when multiple statutory grounds for termination are alleged and the trial court issues a broad-form question asking the jury whether the parent-child relationship should be terminated, we must uphold the jury's finding if any of the statutory grounds alleged supports it. *In re B.K.D.*, 131 S.W.3d 10, 16 (Tex. App.—Fort Worth 2003, pet. denied). The jury, after being instructed that termination required clear and convincing evidence of at least one of these grounds, found that appellant's parental rights should be terminated. The trial court found that the evidence supported affirmative findings on all three grounds.

We will focus on Family Code subsection 161.001(1)(D), which requires clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(1)(D). Endangerment can be less than actual injury, and includes merely exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Endangerment" requires a showing of exposure to loss or injury or jeopardy of a child's emotional or physical health. *Id.* Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *In re D.C.*, 128 S.W.3d 707, 715 (Tex. App.—Fort Worth 2004, no pet.). Endangering conduct may occur either before or after the child's birth. *See In re U.P.*, 105 S.W.3d 222, 233-34 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *see also In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The law does not require that the child be a victim of abusive conduct before the Department can involuntarily terminate a parent's rights to the child. *Dallas Cnty. Child Protective Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no writ). If a parent abuses

or neglects the other parent or children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct. *In re W.J.H.*, 111 S.W.3d 707, 716 (Tex. App.—Fort Worth 2003, pet. denied). Additionally, domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston 2003, no pet.). However, evidence that a parent is a victim of spousal abuse, by itself, is no evidence that awarding custody to that parent would significantly impair the child. *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990).

From this record, the jury and the district court could reasonably have concluded that the evidence satisfied Family Code section 161.001(1)(D). Although there is no evidence that the child was physically harmed, there is evidence clearly supporting a finding that appellant knowingly allowed her child's well-being to be endangered. Appellant testified that Robert began pushing and shoving her while she was in her third trimester of pregnancy with the younger child. Within a few weeks after the child was born, Robert hit appellant in the head and gave her a concussion. Although she took Robert to the police and got an emergency protective order against him, she said she stayed with him because she felt like that would help avoid future problems with him. She also hoped that he would get back on his medications. There was "probably" another incident in January 2011. Appellant put herself and the child in the same home with Robert and then, despite these incidents of abuse, appellant married him. Three days later, he threatened to kill appellant, and still she stayed and placed herself and the child with Robert. That her decision to remain with Robert placed the child in danger was made crystal clear when Robert hit appellant in the head while she was feeding the child. Appellant then left the child on the bed surrounded by pillows and engaged in a confrontation with Robert that involved hurling objects and direct physical struggle. Although

14

appellant claimed that the struggle did not involve the children, she was unaware that her older child reported that she saw part of it and was scared. There was no evidence of any immediate emotional effect on the child involved in this case, but there was evidence that the older child was scared. When testifying about the negative effect of tensions and arguments between appellant and the older child's father, the older child's therapist opined that younger children are even more vulnerable to emotional damage. The evidence is factually and legally sufficient to support the finding by clear and convincing evidence that appellant knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the child's physical or emotional well-being.

Because the judgment can stand on a single finding under Family Code section 161.001(1), we need not consider the evidentiary support for the other findings under that subsection. *See* Tex. Fam. Code § 161.001; Tex. R. App. P. 47.1; *In re A.V.*, 113 S.W.3d at 362.

**Best interest of the child**

The Legislature built into the Family Code a presumption that preserving the parent-child relationship is in the best interest of a child. *See* Tex. Fam. Code §§ 153.131(b), .191, .252. It is the Department's burden to rebut this presumption. *Hall v. Harris Cnty. Child Welfare Unit*, 533 S.W.2d 121, 122-23 (Tex. Civ. App.—Houston [14th Dist.] 1976, no writ). The Texas Supreme Court has compiled factors to consider when determining the best interest of a child. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors include (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the

15

stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Id.* No one factor is controlling, and the facts of a case may mean that evidence of one factor is sufficient to support a finding that termination is in the children's best interest. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.). The best interest standard does not permit termination merely because a child might be better off living elsewhere. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.).

*The child's desires and physical and emotional needs*

Evidence on the first two *Holley* factors is inconclusive. The child did not testify as to her desires as she was not quite two years old. The child's pediatrician testified that the child and appellant appeared very bonded during their visits. Appellant testified that the child was happy and excited to see her during their last visit. Therapist Mabray testified that the child was very open with appellant and was very happy to go to appellant. Caseworker Preece, however, testified that she did not see a particular bond between appellant and this child. There is no showing that the child has any unusual physical or emotional needs now or in the future.

*Physical and emotional dangers to the child*

Evidence of appellant's history of volatile relationships with men raises concerns about continued emotional and physical dangers to the child from not terminating the parent-child relationship. Despite having first-hand knowledge of Robert's increasingly abusive tendencies—both emotional and physical—appellant not only stayed with Robert, she married him. As discussed above, appellant was holding the child when Robert hit appellant in the head,

16

after which appellant left the child unattended on a bed. And, although appellant denied having a romantic attachment to Robert after February 2011, there was testimony that they were holding hands at the hospital, and Robert testified that they remained romantically involved throughout 2011 after the children were removed from her custody.

Robert was not appellant's only abusive or volatile relationship. Appellant reported that she had experienced similar abusive behavior from the father of her older child. The volatility of that relationship did not end with the romance. According to CASA volunteer Mortimer, after a visit with the older child, appellant followed him to the location where he returned the child to her father, where appellant verbally accosted the father and spoke to their daughter in a way that left the daughter sobbing. The older child's therapist reported that the older child feared visits with appellant because of appellant's anger. Appellant's visits with the older child were suspended and, when they resumed, appellant reportedly[5] took the child to a man's house and left her alone with an unknown child while appellant and the man "engaged in some other kind of activity." Although appellant denied being in a new romantic relationship, there was testimony at the jury trial that an old friend was occasionally staying over at her house and that she was fighting with him. Finally, within two weeks before the jury trial, appellant sent 125 texts to Robert's father in which, according to him, she called him Satan and threatened to blow him away. Although Robert's father admitted to sending texts that goaded appellant, her response to that behavior—particularly at a critical time in this litigation—calls into question her ability to protect her child from emotional dangers.

---

[5] CASA volunteer Mortimer related what the older child's father told him the child had said about the visit.

Evidence regarding whether appellant had the skills to address these emotional dangers was mixed at best. Appellant testified that she had learned a great deal about the dynamics and risks of abusive relationships and was prepared to protect her child from them. Therapist Mabray testified that appellant had progressed in her understanding of relationships with men, but the reported new relationship arose after their therapy ended and concerned Mabray. Psychological evaluator Shinder testified that appellant had poor problem-solving skills, no family support, poor judgment in seeking potential sources of support, and poor ability to perceive risk and recognize danger. His testing revealed her as a little more physically aggressive than usual and more likely to lie. The latter was a particular problem because that test indicated that she was likely to deny problems and refuse to change. Shinder conducted a followup exam in July 2012 in which he saw no major differences. He opined that he would have expected to see different scores had she made any substantial progress through her services.

*The parenting ability of the persons seeking custody and the programs available to help them*

Both of appellant's children were physically healthy when removed from her custody and remained so thereafter. Appellant raised repeated concerns about bruises and rashes the child acquired while in foster care, but examinations by physicians deemed these conditions due to normal experiences growing up and in child care. Appellant participated in therapy and classes, claiming she had learned a great deal.

McMillian, however, testified that her sessions with appellant's older child persuaded her that appellant was a very poor parent because she put her needs before her children's needs. McMillian testified that she did not think appellant was capable of parenting a child. Mortimer agreed that appellant put her needs before those of her children—as evidenced by her confrontation

18

with the older child's father that left the child sobbing and fearful and resulted in the suspension of appellant's visitation rights. As discussed above, Shinder testified that appellant's participation in services had not ameliorated any of the results that concerned him regarding her ability to perceive risks and solve problems—key skills for a parent.

*Plans for the child and stability of the home or proposed placement*

Appellant owns her home that has a furnished room for the child. She planned to keep the child in a monitored daycare while she worked. The evidence discussed above regarding the volatility of appellant's conduct in relationships with Robert, Robert's father, the older child's father, and the reported new boyfriend raises concerns about the stability of her home even if she no longer has contact with Robert and his father.[6] Shinder's testimony regarding his evaluations of appellant casts doubt on her ability to recognize and avert threats to stability.

The Department planned for adoption by the child's foster parents. Appellant raised repeated concerns about the child's safety in foster care, but examinations by physicians and investigations by peace officers revealed no evidence of wrongdoing by the foster parents.

*Acts or omissions that may indicate that the parent-child relationship is not proper*

In addition to the evidence that appellant exposed her child to Robert's volatility, the older child's therapist opined that appellant's volatility had caused a role reversal in that the older child worried about appellant in a parenting capacity. McMillian testified that appellant was improperly involving the older child in appellant's conflict with that child's father. While this

---

[6] Robert relinquished his parental rights and there were reports that he had a new girlfriend and was in prison.

evidence does not bear directly on appellant's relationship with the younger child, it casts some light on appellant's ability to have a proper relationship with her child.

*Opinions regarding termination*

Several witnesses were asked whether they thought appellant's parental rights should be terminated. While their answers are not binding, we will review them. Appellant and Robert opined that her rights should not be terminated. Therapist Mabray testified that she would have recommended against termination at their last therapy session in May 2012, but that appellant's reported relationship with another man concerned her and made her unable to give a recommendation at trial. Caseworker Preece, CASA Mortimer, and Robert's father all testified that termination and adoption was in the child's best interest.

*Summary*

Although there is evidence opposing termination, the record contains evidence that the jury and the district court could have found to be clear and convincing that termination is in the child's best interest. Evidence that appellant stayed in the relationship with Robert even though she knew he was becoming increasingly violent and gave her a concussion, that she continued to involve Robert in her life for almost a year after he hit her while she was holding the child, that she interacted with the older child's father in ways that scared their daughter and suspended their visitation, that she was involved in a new volatile relationship, and that she lacked the ability to perceive dangers and problems and deal with them effectively support the conclusion that termination of her parental rights is in the child's best interest. The evidence is legally and factually sufficient to support this finding.

## Conclusion

We affirm the decree terminating appellant's parental rights to her younger child.

_____

Jeff Rose, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed

Filed:   October 17, 2013