

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-15-00399-CV

**IN THE INTEREST OF L.D.F.**, et al., Children

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-01274
Honorable Martha B. Tanner, Judge Presiding

Opinion by:    Jason Pulliam, Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Rebeca C. Martinez, Justice
Jason Pulliam, Justice

Delivered and Filed:  December 9, 2015

AFFIRMED

Appellant R.R. ("Mother") appeals the trial court's judgment terminating her parental rights to her children L.D.F., B.L.F., J.L.F., and E.M.F. ("the Children").[1]  Mother argues the evidence is insufficient to support the trial court's finding that (1) Mother engaged in conduct or knowingly placed the Children with persons who engaged in conduct which endangered the physical or emotional well-being of the Children; and (2) termination of Mother's parental rights is in the best interest of the Children.  We affirm the trial court's judgment.

---

[1] To protect the identity of the minor children, we refer to the children's parents as Mother and Father and to the children by their initials.  *See* TEX. FAM. CODE ANN. § 109.002 (West 2014); TEX. R. APP. P. 9.8(b)(2).

**PROCEDURAL HISTORY**

On May 30, 2014, the Department filed a petition to terminate Mother's parental rights. Following an adversary hearing held on June 11, 2014, the trial court signed a temporary order assigning the Department as temporary managing conservator of the Children and assigning Mother and W.F. ("Father") as temporary possessory conservators with limited access.

The trial court held a status hearing and permanency hearings, and the parties tried the case to the bench between June 15 and June 22, 2015. Mother was present at trial, was represented by court-appointed counsel, and testified. After receipt of evidence and testimony, the trial court rendered judgment terminating Mother's parental rights, based upon the following ground for termination: Mother engaged in conduct or knowingly placed the Children with persons who engaged in conduct which endangered their physical or emotional well-being, pursuant to Texas Family Code Section 161.001(1)(E). The trial court also found termination of Mother's parental rights to be in the best interest of the Children, pursuant to Texas Family Code Section 161.001(2). Mother perfected this appeal.

**ANALYSIS**

Mother complains the evidence is legally and factually insufficient to support the trial court's finding of a statutory ground for termination of her parental rights pursuant to Texas Family Code Section 161.001(1)(E), and the evidence is legally and factually insufficient to support the trial court's finding that termination is in the best interest of the Children. *See* TEX. FAM. CODE ANN. §§ 161.001(1)(E), (2) (West Supp. 2014).

Mother argues the Department failed to present evidence Mother demonstrated a voluntary, deliberate, and conscious course of conduct endangering the Children's physical and emotional well-being. Additionally, Mother argues any abuse the Children suffered at Father's hands

happened outside of Mother's presence, and she consistently engaged in conduct that supported, instead of endangered, the Children's physical or emotional well-being.

## Standard of Review

To support termination of parental rights under Family Code Section 161.001, the Department must establish by clear and convincing evidence one or more of the acts or omissions enumerated under subsection (1), **and** termination is in the best interest of the child. TEX. FAM. CODE ANN. §§ 161.001(1), (2); TEX. FAM. CODE § 161.206(a) (West Supp. 2014); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). Both elements must be established, and termination may not be based solely on the best interest of the child. *Tex. Dep't of Human Srvs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

A parent's right to the companionship, care, custody, and management of children is a constitutional interest "far more precious than any property right." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re J.F.C.*, 96 S.W.3d at 273. Consequently, termination proceedings must be strictly scrutinized, and "involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. Because termination "is complete, final, irrevocable, and divests for all time that natural right … the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Id*.; *see In re J.F.C.*, 96 S.W.3d at 264-66. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 265-66. An appellate court must not reweigh issues of witness credibility but "'must defer to the [factfinder's] determinations so long as those determinations are not themselves unreasonable.'" *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

Under the strict scrutiny implicit in termination cases and the necessity of clear and convincing evidence, the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264-66. Instead, in conducting a legal sufficiency review in a termination-of-parental-rights case, an appellate court must view all of the evidence in the light most favorable to the finding and determine whether a reasonable factfinder could have formed a firm belief or conviction that its ultimate findings are true. *See id.* at 266. In viewing the evidence in the light most favorable to the judgment, the appellate court "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* If, after conducting its legal sufficiency review of all the evidence, a court determines no reasonable factfinder could form a firm belief or conviction consistent with the final judgment, then the court must conclude the evidence is legally insufficient. *In re J.F.C.*, 96 S.W.3d at 264-66.

In conducting a factual sufficiency review in a parental-rights termination case, the appellate court must review and consider the entire record, including evidence contrary to the judgment, and determine whether the disputed evidence is such that a reasonable fact finder could have formed a firm conviction or belief about the truth of the Department's allegations. *Id.* The appellate court assumes the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregards all evidence that a reasonable factfinder could have disbelieved. *Id.* In reviewing factual sufficiency, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.*

**Statutory Grounds for Termination**

*Termination Based on Section 161:001(E): Endangerment*

Under Subsection (E), the trial court was required to find, by clear and convincing evidence, that Mother "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(E). The term "endanger" means that the child was exposed to loss or injury or jeopardized. *In re T.N.S.*, 230 S.W.3d 434, 438 (Tex. App.—San Antonio 2007, no pet.). Endangerment encompasses more "than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *In re S.M.*, 389 S.W.3d 483, 491 (Tex. App.—El Paso, 2012, no pet.). Likewise, while endangerment often entails physical endangerment, the statute does not require that conduct be directed at a child or cause actual harm, rather, it is sufficient if the conduct endangers the emotional well-being of the child. *Id*. Thus, the court's inquiry encompasses acts that endanger a child's physical or emotional well-being or both. *Id*.

The relevant inquiry for termination under Subsection (E) is whether evidence exists that the endangerment was the direct result of the parents' conduct, including acts, omissions, or failures to act. *Id*. Termination requires a voluntary, deliberate and conscious course of conduct; it must be based on more than a single act or omission. *Id*. It is not necessary that the parents' conduct be directed at the child or that the child actually suffer injury. *Id*; *In re T.N.S.*, 230 S.W.3d at 439.

**The Evidence**

Mother and Father had four children together: L.D.F who was born in 2007; B.L.F. who was born in 2008; J.L.F. who was born in 2011; and E.M.F. who was born in 2013. Prior to the instant case, Mother voluntarily relinquished custody of L.D.F. and B.L.F. in 2008, and the children returned to her custody in 2009. In 2011, the Department removed L.D.F. and B.L.F.

from the home, and returned the children in 2012 after Mother complied with the Department's service plan.

The trial court heard evidence of the Department's extensive involvement with the family, which began with an allegation of physical abuse against Father when L.D.F. was just six months old. Subsequently, the Department received allegations of neglectful supervision regarding occasions on which L.D.F. or B.L.F. exited the home while unaccompanied and unsupervised. Mother testified one such allegation, which involved B.L.F. entering a neighbor's home while bleeding, was a false report made by the neighbor following a verbal altercation between the neighbor and Father, but she acknowledged the two children were able to leave the home undetected. The trial court heard evidence of additional occasions when Mother left the Children in Father's sole care, including an incident in which B.L.F. slipped, fell, and injured his lip when Father left him in the bathtub unattended.

The record reflects the Department also received reports of physical abuse. The Department submitted photographs depicting various cuts, bruises, and abrasions on the Children. Mother explained the bruises and other injuries could be attributed to roughhousing, and she described the injuries as normal bumps and bruises. Mother also testified many of the injuries sustained by B.L.F. were caused by the child himself because of his "mobility issues" and because he slammed his body against any available surface when having a tantrum. Mother admitted she believed some of the injuries were caused by Father's harsh discipline, but had no explanation for why she continued to leave the Children in Father's sole care on weekends.

Mother testified she left the home each weekend to earn fifty dollars by cleaning the home of Lynn Thompson. Emily Chamberlain, a visitation monitor at the children's shelter, testified Mother confessed to using the weekends away as a "break" and to party. Further, Mrs. Thompson testified she and her husband had an arrangement with Mother in which Mother engaged in sexual

intercourse with Mr. Thompson while Mrs. Thompson watched. Mother testified she continued this arrangement despite her concerns regarding the Children's safety with Father.

The trial court also heard evidence regarding the conditions of Mother's home. Department caseworker Nicole Solis testified she worked with the family in 2008 and 2009. Solis visited the family two or more times a month for several months, and according to Solis, the majority of the times she visited, the home was filthy and in deplorable condition. Solis reported the home was consistently dirty with trash and dirty laundry throughout the home, exposed dirty diapers and used tampons on the floor, and food caked on a high chair that attracted flies. According to Solis, Mother reported she was overwhelmed caring for two small children.

Mother acknowledged the home had a cockroach problem and was "a little" dirty at the time of the 2011 removal. Photographs submitted by the Department depicted trash and diapers littering the floor and a child's bare feet nearly blackened with dirt. A Department caseworker made a surprise visit to the home the day before the 2014 removal, and the record reflects the caseworker found the home in unhealthy and unsafe conditions. Human fecal matter and trash covered the floor, and the home smelled strongly of cat urine. The Children were found with dirt and dried food on their faces, and feces on their feet.

The Department presented evidence of its attempts to work with Mother regarding the poor condition of the home, as well as evidence of the lack of improvement on Mother's part. Mother testified she cleaned every day, but the home deteriorated into deplorable conditions when she left for the weekend. However, Mother also testified she decided not to clean because she was tired of being the only one who did so. Mother acknowledged the conditions were especially dangerous for B.L.F. who suffers from Pica disease and put things in his mouth indiscriminately and without scrutiny.

L.D.F. made an initial outcry of sexual abuse against Father in August 2014. Her outcry included statements giving rise to the concern Father sexually abused B.L.F. and J.L.F. as well. The Department notified Mother, but Mother testified she did not believe the Department's report. Mother asserted she knew nothing about the sexual abuse occurring until after L.D.F. made an outcry against Father directly to Mother at the beginning of October 2014. The trial court heard other testimony, however, that Mother suspected sexual abuse much earlier. In January 2014, Mother took L.D.F. and E.M.F. to the hospital for examinations upon the advice of a Department caseworker and because the two children displayed physical symptoms consistent with sexual abuse. According to Mother, the results of the exams were negative, and her suspicions were allayed. However, the trial court heard evidence of yet another incident that caused Mother to suspect sexual abuse. Chamberlain testified Mother described an incident in which Mother returned home early to find all four children completely naked, and B.L.F. alone with Father in bed. Chamberlain testified Mother reported the incident caused her concern. Mother, however, continued leaving the Children alone with Father overnight when she went to the Thompson's home.

We have thoroughly reviewed the evidence in this case. After review of all the evidence in the light most favorable to the trial court's finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction Mother engaged in conduct or knowingly placed the Children with persons who engaged in conduct which endangered the Children's physical or emotional well-being. The evidence revealed Mother consistently left the Children in Father's sole care each weekend so she could have her own time despite the pattern of injuries and incidents showing the Children were not safe in Father's care. Mother also continued to leave the Children in Father's care despite her suspicions of sexual abuse and fears the Children were not safe with Father. The evidence further demonstrated a pattern of Mother's inaction regarding the condition

of the home she maintained for the Children. The evidence showed the conditions were unsafe and unhealthy for the Children, and especially dangerous for B.L.F. The evidence is, thus, legally sufficient to support the trial court's termination findings under Family Code Section 161.001(1)(E).

Based upon this same evidence and considering the entire record, a factfinder could reasonably form a firm conviction or belief that Mother violated Section 161.001(1)(E). Consequently, based upon the same evidence and conclusions, the evidence is also factually sufficient to support the trial court's termination findings under Section 161.001(1)(E).

We hold the evidence is legally and factually sufficient to support the trial court's finding that termination of Mother's parental rights to the Children was warranted pursuant to Section 161.001 (1)(E). Thus, we overrule Mother's appellate issue with regard to this finding.

### Best Interest of the Children

Mother next challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the Children.

When considering the best interest of the child, we recognize the existence of a strong presumption that the child's best interest is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, we also presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West 2014). In determining the best interest of the child, the court may consider the following factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts

or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not exhaustive. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* In analyzing these factors, the court must focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dept. of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

Further, the same evidence proving acts or omissions under Family Code Section 161.001(1) may be also probative of best interest of the child. *In re C.H.*, 89 S.W.3d at 28. A factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2004, pet. denied).

Turning to the evidence regarding the best interest of the child, we consider the *Holley* factors as outlined above.

### *Desires of the Children*

As to the first factor, evidence weighs in favor of the trial court's finding. At the time of trial, L.D.F. was the only child able to verbally communicate her desires. B.L.F., although seven years' old, possessed intellectual disabilities causing the inability to verbally communicate. J.L.F. and E.M.F. were too young to communicate.

Child Advocate P.R. ("the volunteer") testified L.D.F. informed her the week before trial she was looking forward to being a part of a "forever family." According to the volunteer, during Mother's visits, L.D.F. was withdrawn and unexcited. The volunteer further testified L.D.F.

related she did not trust Mother, did not feel safe around Mother, and did not want to be around Mother. Eventually, L.D.F. decided she wanted no more visits with Mother. Judith Dickey, a counselor who worked with L.D.F., testified L.D.F. expressed anger toward Mother for failing to protect her from Father.

### *Physical and Emotional Needs*

Because of the age and intellectual limitations of the other three children, at the time of trial, L.D.F. was the only child able to take part in professional counseling. ChildSafe counselor Adam Campos testified L.D.F. was in the early stages of the therapeutic process despite being in counseling since August 2014. According to Campos, for L.D.F.'s therapy to progress successfully, L.D.F. needed a caregiver who would go beyond simply providing basic needs, listen to her, provide nurturing, make her feel safe, and reinforce the skills L.D.F. learned in therapy.

The trial court heard evidence E.M.F. recently began physical therapy, occupational therapy, and speech therapy, and was seeing a delayed disability specialist. The volunteer testified J.L.F exhibited signs of being developmentally delayed. J.L.F. understood some commands, but did not respond verbally often. The trial court heard evidence indicating J.L.F. and E.M.F. were exposed to abuse, but there was no way to know how affected by the abuse they may be because they lack the vocabulary to fully convey their feelings and ideas.

The volunteer testified she observed improved behavior in the younger children the longer they were removed from Mother's custody. While J.L.F. and E.M.F. were too young to communicate effectively, the volunteer testified she observed the two younger children engaging in healthy and normal behavior in their foster placement. The volunteer testified she observed healthy conflict such as not wanting to share toys, wanting to be first, and attempting to gain attention, whereas when the children were first removed from Mother's custody, their behavior was atypical in that the children never fought or exhibited healthy conflict among themselves.

The volunteer also testified B.L.F.'s behavior improved considerably when he was moved into institutionalized placement to handle his specific needs.[2] Despite B.L.F.'s improvement, caseworkers testified they did not believe Mother would be able to provide the attention needed to properly address B.L.F.'s continued needs. Mother admitted she would likely not be able to provide for B.L.F.'s medical and behavioral needs.

The trial court could infer, from Mother's past and recent conduct and given the likelihood all of the Children would require continuing therapy and counseling, as well as Mother's admission she would likely not be able to meet the needs of even one child, that Mother was not capable of meeting the Children's physical and emotional needs in the future.

***Physical and Emotional Danger***

Mother testified she would do her best to protect the Children from any future unhealthy relationships. However, Mother admitted she had poor judgment regarding the people she allowed in her life. For example, Mother testified she believed Alan "A.J." Thompson, Jr., the son of Lynn Thompson and her husband, a man with whom she had a short romantic relationship and then continued to share an apartment, had "psychiatric issues." Despite this, Mother allowed A.J. to accompany her to the supervised visits with the Children.

Caseworkers and counselors testified B.L.F. had not received counseling or therapy for the abuse he suffered because of his intellectual disabilities. B.L.F. continued acting out and exhibiting inappropriate sexual behavior. Mother testified she would be able to watch over B.L.F. and recognize whether he acted out inappropriately against his siblings. Mother admitted, however, she had not been able to recognize the signs in the past. Campos testified the siblings

---

[2] B.L.F. was diagnosed with Marfan's syndrome, attention deficit disorder, oppositional defiance disorder, Pica disease, and "borderline" autism. Marfan's syndrome is a genetic connective tissue disorder affecting joints and body tissue, including the eyes, spinal cord, and heart.

have a history of sexually reacting with each other, and he recommended they should always be monitored and the four should not share a room, but have individual rooms. With regard to L.D.F., Campos testified any instability, reversion to the role of caregiver, or exposure to sexually inappropriate behavior would cause L.D.F.'s therapy to regress.

The trial court could infer from the evidence regarding Mother's inability to protect the Children in the past, as well as her current conduct, that Mother was not capable of protecting the Children against physical and emotional danger in the future.

## *Parental Abilities*

With regard to the fourth factor, the evidence weighs in favor of the trial court's finding. The trial court heard evidence regarding Mother's parenting skills, or lack thereof. Dickey testified L.D.F. reported cleaning the home and supervising her younger siblings when she was seven years old and younger. The volunteer testified L.D.F. would not fully relax or enjoy playing with her siblings because L.D.F. was too concerned with their physical and emotional needs. According to the volunteer, L.D.F. cleaned the others, checked their diapers, and comforted the others when they were upset. While the two younger children were not able to verbally express their experiences, the volunteer testified she witnessed J.L.F. and E.M.F. treating L.D.F. as a mother figure even when Mother was present during the visitation.

The volunteer further testified Mother demonstrated lack of engagement with B.L.F. during visits. According to the volunteer, Mother treated B.L.F. differently, would not play with him, and would not make eye contact with him. The volunteer testified B.L.F. would attempt to engage Mother, but Mother would instead focus her attention on her cell phone. Department caseworker Peydon Sharkey testified Mother did not display interest in B.L.F.'s birthday, although Mother called the other children and gave them gifts on their birthdays.

*Stability of the Home*

The evidence demonstrated that since the Children's removal, Mother did not maintain stable employment or stable housing. Mother testified she lived with the Thompsons for approximately four months following the Children's removal. She moved into her own residence for approximately three weeks, but was unable to pay rent at that location when she lost her job at a convenience store. She then lived with A.J. for approximately nine months. Mother testified she worked at another convenience store for six months while living with A.J. but reported she lost her job when she accepted counterfeit money. Counselor Sylvia Vargas testified, however, Mother related she was terminated because "her roommate was harassing her."

The volunteer testified she visited the apartment Mother shared with A.J. several times. According to the volunteer, the floor was dirty and covered with trash, the kitchen counters were cluttered, and the furniture was soiled with cat urine and feces. She further testified the bathtub was black and the toilet was stained from not being cleaned. According to the volunteer, a strong odor permeated the apartment, and the volunteer nearly became ill from the smell in the bathroom. Sharkey testified there was a noticeable odor of cats in the apartment. According to Sharkey, when Mother was confronted with the condition of the apartment, she explained she was working long hours or had been sleeping. At trial, Mother described the apartment's condition as "fine" with the exception of the cat odor, but agreed the condition was "unacceptable in CPS's eyes."

Mother testified she had been working part-time at a fast food restaurant for three months and living with coworker Marian Smith and Smith's boyfriend for a month at the time of trial. Mother testified she currently used one extra bedroom, but that Smith was going to allow her the use of an additional room for the Children. According to Mother, the space was large enough for her and all the children, but it was temporary. Mother planned to place the two boys in one room and the girls in the other while she slept in the living room.

The volunteer testified the only furnishings in Smith's home when she visited were a coffee table and fish tanks. The volunteer further testified all other belongings were on the floor, including bedding and clothing. According to the volunteer, Smith's boyfriend related the Children were not welcome in the home and Mother was welcome for only another week. Sharkey testified Smith's boyfriend informed him Mother was supposed to have moved out the week before trial. Smith, however, testified Mother and the Children were welcome until Mother was living independently, which Smith estimated would be within two to three weeks.

The testimony at trial showed the Department had not yet approved Smith's home because Smith and her boyfriend were reluctant to provide the Department access to their home and refused to provide information for purposes of background checks. Mother admitted Smith had a history of involvement with the Department and Smith's boyfriend had a criminal background involving drugs.

In light of Mother's historic inability to provide a stable home for the Children and the testimony regarding the current lack of stability in Mother's employment and living situations, the trial court could infer that Mother will be unable to meet the Children's need for stability in the future.

### Plans for the Children

Regarding the final factor, the evidence weighs in favor of the trial court's finding. Mother testified she intended to enroll the two older children in public school and after-school care, and she planned to place the two younger children in daycare. Mother testified she hoped she would soon be working full-time to afford childcare and housing, and she stated she intended to find an apartment for her family. However, Mother admitted she had not yet actually contacted any apartment complexes and had yet to finalize full-time employment.

**Conclusion**

After determination and weight of the *Holley* factors and viewing the evidence in the light most favorable to the finding, we conclude the trial court could reasonably have formed a firm conviction that termination of Mother's parental rights is in the Children's best interest. Thus, the evidence is legally sufficient to support this finding. Based upon the same evidence and conclusions, the evidence is also factually sufficient to support the trial court's finding that termination was in the Children's best interest.

## CONCLUSION

Based on the foregoing reasons, we overrule Mother's points of issue in which she challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights was warranted under Texas Family Code Sections 161.001(1)(E) and termination was in the best interest of the children. We affirm the trial court's judgment as to Mother. No costs shall be assessed against Mother in relation to this appeal because she qualifies as indigent.

Jason Pulliam, Justice